COMMONWEALTH *vs.* GILBERT DIAS.

Bristol.    April 5, 1977. — September 21, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Homicide. Malice. Practice, Criminal,* Questioning of witness by judge, Capital case.

At a trial for murder with a shotgun which had to be "broken open" to be reloaded after firing a single shot, there was no error in the denial of a motion for a mistrial by reason of the judge's questioning of the only defense witness in an attempt to clarify his testimony as to the actual manner in which the gun had discharged, on which there was conflicting testimony, where the judge gave an instruction to the

---

[18] We find unconvincing an argument by the director based on the evolution of § 46A.

jury as to its function in finding facts which overcame any possible prejudice to the defendant from the judge's questioning. [415-417]

This court in a capital case did not, under G. L. c. 278, § 33E, reduce a verdict of guilty of murder in the second degree to manslaughter where there was evidence that the defendant, after discovering the presence of unknown persons in his home, procured an unloaded shotgun, loaded it, and entered his kitchen, a small area then occupied by several persons, brandished the gun and demanded that the premises be vacated, and that the victim was killed by a shot from that gun. [417-419]

INDICTMENT found and returned in the Superior Court on June 12, 1974.

The case was tried before *Brogna,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Kenneth L. Sullivan* for the defendant.

*Lance J. Garth,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J.    Gilbert Dias (Dias) was indicted for the murder of Gerald Travis, the indictment charging murder in the first degree. The jury returned a verdict of guilty of murder in the second degree. The case, having been subject to G. L. c. 278, §§ 33A-33H, comes here on Dias's appeal. Dias challenges his conviction on the ground that the trial judge's questioning of a defense witness deprived him of a fair trial. Additionally, Dias urges this court to exercise its extraordinary power under G. L. c. 278, § 33E, to reduce the verdict to manslaughter. We find no error, and affirm the conviction. We decline to grant the relief authorized by c. 278, § 33E.

The relevant facts are summarized.

On the evening of March 15, 1974, the victim Gerald Travis (Travis), accompanied by Russell Greene (Greene), and Fernando Mello (Mello), went to a bar, The Republican Club, in Fall River. There the group met another friend, Thomas Wing (Wing). Each of them consumed several beers. In the course of the evening, the young men traveled to another bar where they continued their beer drinking and socializing until closing time, whereupon they

proceeded to a third tavern, which had also closed. Not yet ready to call an end to the evening's activities, Mello's companions accepted his invitation to go to Dias's apartment; Mello, the only member of the group acquainted with Dias, had been staying at his apartment for several days prior to March 15.

Though no one was at home, the group entered the apartment, and, while Mello gave Wing and Greene a tour of the premises, Travis retired to the kitchen and began frying eggs and sausages. In the course of their tour, Mello happened on two shotguns leaning against the bureau in Dias's bedroom and a box of shotgun shells atop the bureau. One of the shotguns, from which the parties agree the fatal shot was fired, was capable of firing only once, and then had to be "broken open" to be reloaded. Although noticing that this gun was unloaded, Mello, wary that his friends might engage in horseplay, hid the gun under a couch in the livingroom and put the bullets in Dias's bureau.

Soon after, Dias returned to his apartment in the company of several friends. Except for Dias, no one in the group arriving was acquainted with any member of Mello's party. Dias appeared upset. According to various accounts, this was because he had lost his wallet, because of the unexplained presence of unknown persons who had placed the kitchen in a state of disarray, or because he could not locate his guns. At any rate, Dias found a gun and shells, loaded the gun, and came into the kitchen. He pointed the gun at Greene, and demanded that the premises be vacated.

There was a conflict in the testimony as to what transpired thereafter. Mello, Greene, and Wing, whose accounts essentially coincided, testified that as Dias entered the kitchen the shotgun was in the "closed" position and the hammer was cocked. Greene pushed the barrel of the shotgun away from his face. At the same time, Travis jumped toward Dias, the lights went out momentarily, and Travis was fatally shot.

Michael Sturgeon (Sturgeon), the only defense witness, was in the group which accompanied Dias to the apart-

ment.[1] He testified that as Dias came into the kitchen, the shotgun which he was brandishing was in the "broken" position, and thus could not be fired. According to his version, Travis jumped toward Dias, and, grabbing the shotgun by the barrel, tore it from the defendant's hand. Still holding the barrel, Travis swung the shotgun at Dias, attempting to use the butt end as a club. Dias put up his arm to fend off the blow, and, on contact, the shotgun slammed shut and accidentally discharged into Travis's chest area.

1. *Judicial Questioning of Defense Witness.*

The judicial questioning of which Dias now complains occurred during the cross-examination of Sturgeon after he had given the above-recounted testimony. As Sturgeon was being cross-examined, the following exchange took place: THE WITNESS: "There was a shell in the gun, there had to be, it went off." THE JUDGE: "When did it go off?" THE WITNESS: "When he struck his arm, the gun went off." THE JUDGE: "Are you telling us that when he struck Dias' arm with the gun broken, that the gun then went off? Is that what you are saying?" THE WITNESS: "The gun couldn't have been open when he swung it." THE JUDGE: "Hm, hm. I understand. It also won't cock in that position, either." THE WITNESS: "Right." THE JUDGE: "But it is your testimony that whatever happened, that the gun went off when it struck Dias' arm, is that right?" THE WITNESS: "Yes."

Immediately, the defendant's counsel moved for a mistrial on the ground that the judge, by saying, "Hm, hm," in effect found as fact that the gun could not have been open when Travis swung it at Dias. On appeal, the defendant contends that the judge, by stating, "It also won't cock in that position, either," was finding a fact, a function which rests exclusively with the jury. G. L. c. 278, § 2.[2]

---

[1] While Sturgeon was the only witness who testified to this version of events, several other persons who arrived at the apartment with him had given similar accounts when questioned by the police.

[2] Despite this apparent change in counsel's view of that which was objectionable, we scrutinize this exchange as a whole.

In essence, Dias contends that, by engaging in this exchange with the witness, the judge was indicating that he found incredible the version of events to which Sturgeon testified on direct examination. We do not agree.

A trial judge "need take no vow of silence. He is there to see that justice is done or at least to see that the jury have a fair chance to do justice." *Commonwealth* v. *Haley*, 363 Mass. 513, 519 (1973), quoting H. Lummus, The Trial Judge 19-21 (1937). He or she "ought to be always the guiding spirit and the controlling mind at a trial." *Goldman* v. *Ashkins*, 266 Mass. 374, 380 (1929). Accordingly, a judge may properly question a witness, even where to do so may strengthen the Commonwealth's case, so long as the examination is not partisan in nature, biased, or a display of belief in the defendant's guilt. *Commonwealth* v. *Festa*, 369 Mass. 419, 422 (1976).

There exists no quantitative test for determining whether the judge has gone beyond the bounds which the law imposes; "[m]uch depends on the nature of the proceeding." *Commonwealth* v. *Campbell*, 371 Mass. 40, 45 (1976). The judge should utilize a "rule of reason" in applying the foregoing standard. *Id.* We do not believe that the judge violated that standard in this instance.

During the presentation of the Commonwealth's case in chief, a firearms expert expressed substantial doubt whether the weapon in question could have fired in the "broken" position and whether it would discharge on concussion without the squeezing of its trigger. The witness, not a firearms expert, apparently was attempting to testify, in a rambling narrative style, that the gun did indeed discharge in that manner. During cross-examination, the judge merely made several inquiries in an attempt to clarify the testimony of this witness. The judge was not attempting to coerce the witness to retract his testimony, cf. *Webb* v. *Texas*, 409 U.S. 95 (1972), nor did the judge, despite the existence of conflicting testimony relating to a crucial issue, inform the jury that the Commonwealth's evidence was not disputed. Cf. *Commonwealth* v. *Hanscomb*, 367 Mass. 726 (1975). His questions were not biased

or coercive; they were aimed at developing the most trust-worthy testimony and clarifying for the jury the witness's testimony. See *Commonwealth* v. *Fiore,* 364 Mass. 819, 827 (1974). Moreover, the judge instructed the jury that "it is your function and yours alone to determine factually what happened. It is your province and yours alone to determine what part — all, or part, or none — of the story that any witness or the opinion of any witness is expressed that you are going to believe and follow. This is your func-tion, not mine." This directive served to overcome any possible prejudicial effect which might have derived from the judge's questioning. See *Commonwealth* v. *Campbell,* 371 Mass. 40 (1976); *Commonwealth* v. *Festa,* 369 Mass. 419 (1976). Though it might have been preferable to have left the clarification of the witness's testimony to the interrogation of the respective attorneys, we note that "the most conscientious judge [is] one who is not content to leave vital questions unasked." *Commonwealth* v. *Hans-comb, supra* at 733 (Hennessey, J., concurring). We con-clude there was no error.

2. *Section 33E Questions.*

Dias urges that a verdict of manslaughter would have been "more consonant with justice" than a verdict of mur-der, *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963), and he therefore asks us to use our power under G. L. c. 278, § 33E, to order the verdict reduced. He argues that the instant case presents a factual situation similar to that in *Commonwealth* v. *Baker, supra* at 110, where we exer-cised our § 33E mitigating powers because we found that a "minor controversy ... where the principals were ac-quainted only slightly, if at all" had "explode[d] into the killing of a human being."

As required by § 33E, we have examined all the evi-dence presented in the trial court. See *Commonwealth* v. *Mahnke,* 368 Mass. 662, 700 (1975), cert. denied, 425 U.S. 959 (1976). There was a plethora of eyewitness testimony, cf. *Commonwealth* v. *Mahnke, supra* at 701, and the jury were instructed correctly on the respective elements of murder, manslaughter, and accidental death. See *Com-*

monwealth v. *Deeran,* 364 Mass. 193 (1973). Our perusal of the record leads us to conclude that the defendant's reliance on *Commonwealth* v. *Baker, supra,* is misplaced. In *Baker* at 119 we exercised our § 33E power on the ground that the evidence clearly showed that the intention to use a deadly weapon "was formed in the heat of sudden affray or combat." *Commonwealth* v. *Jones,* 366 Mass. 805, 809 (1975), construing *Commonwealth* v. *Baker,* 346 Mass. 107, 119 (1963). See *Commonwealth* v. *Young,* 326 Mass. 597, 601 (1950).

In the instant case, there was evidence from which the jury could have found, as apparently they did, that Dias, after discovering the presence of unknown persons in his home, procured an unloaded shotgun, loaded it, and entered his kitchen — a small area then occupied by several persons — brandished the gun and demanded that the premises be vacated. The victim was killed by a shot from that gun. "It has long been recognized in this Commonwealth that malice may be inferred from the intentional use of a deadly weapon." *Commonwealth* v. *Gagne,* 367 Mass. 519, 522 (1975). *Commonwealth* v. *Festa,* 369 Mass. 419, 424 (1976). There was no evidence of "sudden combat in which the deceased was originally the aggressor," *Commonwealth* v. *Kendrick,* 351 Mass. 203, 210 (1966), or that the defendant "was subjected to any angry confrontation," *Commonwealth* v. *Kinney,* 361 Mass. 709, 713 (1972), nor was it a case of "uncontrolled anger and violent action on the part of both the defendant and the decedent," *Commonwealth* v. *Ransom,* 358 Mass. 580, 583 (1971).

Instead, we are confronted with a killing which resulted from the defendant's deliberate use of a deadly weapon. Under similar facts we have declined to exercise our § 33E powers. See *Commonwealth* v. *Rooney,* 365 Mass. 484, 495 (1974); *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 312 (1973); *Commonwealth* v. *Deeran,* 364 Mass. 193, 196-197 (1973); *Commonwealth* v. *Pratt,* 360 Mass. 708, 715 (1972). Mindful that "the mitigating power under § 33E is to be exercised sparingly," *Commonwealth* v. *Seit, ante,*

83, 95 (1977), we conclude that the verdict of murder in the second degree is appropriate. See, e.g., *Commonwealth* v. *Fournier*, 372 Mass. 346, 350 (1977).

*Judgment affirmed.*