COMMONWEALTH vs. GEORGE ROGERS.

Suffolk. October 9, 1979. – November 8, 1979.

Present: HALE, C.J., GOODMAN, & BROWN, JJ.

*Practice, Criminal,* Deliberation of jury, Questioning of witness by judge.

At a criminal trial, the judge's questioning of a defense witness was not prejudicial to the defendant where the questions were designed to clarify matters for the jury and were not hostile and where the judge's instructions to the jury dispelled any possible harmful effect. [650-651]

At the trial of a defendant charged with conspiracy to commit larceny of more than one hundred dollars from the Commonwealth, conspiracy to bribe public officials, and conspiracy to seek a bribe to influence his official acts, the fact that the jury, during their deliberations, requested a definition of conspiracy, after previously indicating that they had reached a verdict on the latter two indictments but not on the first, did not necessarily indicate that they had applied the wrong legal principles to their consideration of the latter indictments and did not require a mistrial. [651-652]

INDICTMENTS found and returned in the Superior Court on March 21, 1978.

The cases were tried before *Ronan,* J.

*Stephen M. Salon (Shari E. Redstone* with him) for the defendant.

*Bernard Manning,* Assistant Attorney General, for the Commonwealth.

HALE, C.J. The defendant appeals from his convictions on three indictments: No. 017988 for conspiracy to commit larceny of more than one hundred dollars from the Commonwealth (G. L. c. 266, § 30); No. 017989 for conspiracy to bribe public officials (G. L. c. 268A, § 2 [a]), and No. 017990 for conspiracy to seek a bribe to influence his official acts (G. L. c. 268A, § 2 [b]). Listed in the

indictments as coconspirators but not as defendants were Patrick J. Weagraff, Edward F. Mackin, Olympus Research Corporation, Gilbert M. Rosenbrier and Public Management Systems. As no question has been raised concerning the sufficiency of the evidence presented at the trial, we need only set out the background facts as the jury could have found them.

While Weagraff was employed as project director for the Department of Education of California, in August, 1974, he met Mackin, the president of Olympus Research Corporation (Olympus), a company engaged in consulting work in the field of education. Mackin and Olympus helped him to secure a new position as associate commissioner for occupational education in the Department of Education (DOE), paying his expenses when he came to Boston for interviews.

Weagraff assumed his duties as associate commissioner in January, 1975. Shortly afterward he became acquainted with the defendant, then a member of the State Senate. The defendant told Weagraff that he was a supporter of vocational education in the Senate and that he needed additional staff to enable him to continue to devote time to vocational education issues. As additional staff was denied him by the Senate President, the defendant asked Weagraff if DOE could either do staff work for him or assign a DOE employee to his staff. Weagraff told him that DOE could not do either. The defendant then told Weagraff that if he could not receive staff assistance, he would ask to be made the chairman of a Senate committee and "that chairmanship would be at the expense of vocational education." Weagraff told the defendant he would see what he could work out.

Weagraff then went to Mackin and told him that he (Weagraff) had "to keep Senator Rogers happy" because he "was very important to vocational education." He asked Mackin whether Olympus would finance the assistance that the defendant had requested. Mackin told him that Olympus was not receiving money from DOE

which could be used to do so. At Mackin's suggestion, Weagraff telephoned Rosenbrier, whose consulting company, Public Management Systems (PMS), was about to receive a $40,000 contract or grant from DOE. Weagraff and Rosenbrier agreed that $10,000 would be added to the contract amount and that PMS would use the additional funds to pay for a research assistant for the defendant.

The defendant was so advised and thereupon told one Cleveland to contact Rosenbrier, which he did. Cleveland worked in the defendant's office from June 2 until December 24, 1975. During that time Cleveland received $4,785 in payroll checks from PMS. He was then replaced by one Leontire, who worked in the defendant's office between January and September, 1976, receiving $5,445 in payroll checks from PMS. While on the payroll, Leontire issued a check on his personal account for $15 to the "Committee to Re-Elect George Rogers" and one for $500, payable to the order of "George Rogers." The jury apparently rejected the defendant's claim that the latter amount was a loan and that the loan was repaid.

In the spring of 1976 the defendant asked Rosenbrier if PMS could continue payments to Leontire beyond the $10,000 amount previously set. Rosenbrier replied that PMS had no more funds available. The defendant later told Rosenbrier that he would speak to Weagraff and others at DOE about other grant proposals which PMS had submitted to DOE. He also told Rosenbrier that he was to be the chairman of a legislative commission on occupational education and that PMS might be able to receive grants from the commission "as an accommodation" for paying Leontire.

In the fall of 1975 the defendant told Weagraff that he had given up his position on the New Bedford city council because of his Senate duties and the inordinate amount of time he was spending on vocational education matters. As a result, he would lose the $5,000 salary

from that position. He asked Weagraff to recommend him for consulting work but Weagraff told him that he was unqualified. The defendant reminded Weagraff of his vocational education advocacy and of the bill he had filed in the Senate which would establish a new department of vocational education. The terms of that bill, known to Weagraff, would make Weagraff commissioner of the new department. Weagraff told the defendant that he felt bad about the defendant's loss and that he would try to work something out. He tried to get Rosenbrier to take the defendant on as a consultant. Rosenbrier refused when Weagraff would not process a grant to cover the amount to be paid to the defendant.

Weagraff then arranged for Mackin to meet with the defendant, and an agreement was reached for Olympus to hire the defendant as a consultant at a salary of $5,000 a year. The defendant told Mackin he did not wish to be paid with funds received by Olympus from the Commonwealth. He was told by Mackin that Olympus received no income other than State funds, although there was a possibility that they might receive a Federal contract. The defendant sent a letter to Mackin setting out the terms of their agreement but stating that it was understood he would not be paid from State funds. Mackin and Weagraff regarded the letter as written for public consumption, referring to it as a "cover your ass" letter, and Mackin sent the defendant a "cover-up" letter in response, confirming the agreement.

During 1976 the defendant received checks totaling $5,321.88 from Olympus, $321.88 of which was reimbursement for expenses he incurred on a trip to Washington. He did no consulting work for Olympus for the $5,000.

In the late fall of 1976, he told Mackin that he had been made chairman of the Joint Committee on Natural Resources and suggested that Olympus submit a grant proposal to the committee in the area of its concern so Olympus could receive funds which would make it possi-

ble for the defendant to remain on its payroll. There were further communications about the matter, but nothing more developed.

Also during 1975 and 1976 the defendant had a number of conversations with Weagraff about a DOE grant to fund a project at Southeastern Massachusetts University (SMU). In the spring of 1976, Weagraff informed the defendant that he had been able to approve $14,000 more than the $25,000 grant requested by SMU. The defendant told Weagraff that he would contact SMU and have them set aside a portion of the money for employment of the defendant should he lose his bid for reelection to the Senate. On October 12, 1976, less than a month before the election and after Weagraff had left DOE, the defendant wrote to the Commissioner of Education and expressed his "keen interest" in seeing that the expansion of the SMU project by Weagraff be honored.

1. The first of two issues raised by the defendant on appeal concerns the questioning by the trial judge of one Joyce Zervis, the defendant's secretary and a witness for the defense. The defendant had testified about work he claimed he had done for Olympus during the trip he had made to Washington at Olympus's expense. He testified about a report that he said he had prepared immediately following that trip. There were two copies of the report in evidence, and the questions of where and when each was prepared were relevant to the reliability of the defendant's testimony. Zervis's testimony concerning where she had typed the two copies of the report was confusing. After Zervis had been cross-examined, the judge, having stated that he wished to assist the jury, asked her a series of questions about the two reports. The defendant claims that the judge's questioning demonstrated that he disbelieved the witness's testimony and made it impossible for the jury to reach an impartial verdict.

We have examined the judge's questioning of the witness and find that it was proper. Although the judge's

questions at times were pointed, they were not hostile. The questioning was not "partisan in nature, biased, or a display of belief in the defendant's guilt." *Commonwealth* v. *Festa,* 369 Mass. 419, 422-423 (1976). *Commonwealth* v. *Dias,* 373 Mass. 412, 416 (1977). It appears that the questions were designed to clarify matters for the jury, and the judge so stated. *Commonwealth* v. *Charles,* 4 Mass. App. Ct. 853 (1976). *Commonwealth* v. *Robinson,* 7 Mass. App. Ct. 600, 606 (1979).

Furthermore, the judge charged the jury, "The fact that I asked questions indicates nothing at all. I have already told you the facts are for you to find, and you find and make your determinations solely upon the evidence . . . ." Even if it could be said that the judge's manner of questioning the witness was overzealous, any possible harmful effect was dispelled by this instruction. See *Commonwealth* v. *Oates,* 327 Mass. 497, 500 (1951); *Commonwealth* v. *Festa,* 369 Mass. at 423. The decision to use a corrective instruction rather than to allow the defendant's motion for a mistrial was within the judge's discretion. *Commonwealth* v. *Sandler,* 368 Mass. 729, 734-735 (1975). *Commonwealth* v. *Lee,* 4 Mass. App. Ct. 453, 459 (1976). There was no abuse of discretion.

2. The defendant contends next that the judge should have declared a mistrial, sua sponte, because of events which occurred during the course of the jury's deliberations. The jury had retired to deliberate at 1:20 P.M., August 17, 1978. The next day the jury sent word to the judge that they had reached a verdict on indictments Nos. 017989 and 017990 but were unable to reach a unanimous verdict on No. 017988. At 2:16 P.M. the judge called the jury back and read them the modified *Tuey* charge (see *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 101-102 [1973]). The jury then continued to deliberate but returned to the courtroom at 4:17 P.M. to request a definition of "conspiracy" from the judge. After the judge redefined conspiracy, the jurors again retired to deliberate. At 5:25 P.M. they returned with a verdict of guilty on all three indictments.

The defendant claims that this sequence of events demonstrates that the jurors could not have understood the law of conspiracy when they reached their verdicts on indictments Nos. 017989 and 017990. This claim is mere speculation. It is not open for us to speculate about the jury's internal decision-making process or to question their understanding of the judge's original instructions during their deliberations. Cf. *Commonwealth* v. *Fidler,* 377 Mass. 192, 198-199 (1979). We note also that although the jury had informed the judge of their agreement on two indictments they did not indicate what those verdicts would be, nor, of course, were the verdicts recorded. The judge did not limit his further instruction on conspiracy to indictment No. 017988 but directed it to all three indictments. Had the jury discovered, after being again instructed, that they had mistakenly applied the wrong legal principles, they could have, and no doubt would have, reconsidered their earlier agreements.

The defendant's contention that the jury's request for a definition of conspiracy indicates that the judge failed in his initial charge to instruct the jury adequately is so lacking in merit as to obviate discussion of it. The defendant has not argued any specific objection to the substance of, or any deficiencies in, the original charge, and as the defense made no suggestion to the judge when invited to do so at the conclusion of the further charge, we would conclude without more that both were complete and error free. However, we have read both charges and are satisfied that they clearly stated the governing legal principles of conspiracy and of the substantive offenses which the conspiracies involved. There was no reason for the judge to have declared a mistrial.

*Judgments affirmed.*