COMMONWEALTH vs. ROBERT A. RAGONESI.

Bristol.  May 5, 1986. — June 5, 1986.

Present: GRANT, KASS, & FINE, JJ.

*Rape. Kidnapping. Practice, Criminal,* Questioning of witness by judge. *Evidence,* Sexual conduct. *Rape-Shield Statute.*

Reversal of a defendant's convictions on indictments for kidnapping, assault and battery, and aggravated rape was required as a result of the judge's questioning of the complainant at a hearing on the prosecutor's motion for a determination of the "voluntariness" of the testimony of the victim, who had expressed reluctance to testify against the defendant, where the case turned on the issue of the complainant's consent and where the judge's extensive and excessive cross-examination on the minutest details of the alleged sexual acts eventually led the complainant to testify at the hearing that the acts had occurred and that she did not consent, despite her inconsistent initial written statement to the police. [324-326]

In a rape case, the trial judge did not abuse his discretion in denying the defendant's motion under G. L. c. 233, § 21B, to introduce extensive evidence of specific instances of the complainant's prior sexual conduct with the defendant, and instead permitting a broad range of general questions concerning the complainant's relationship with the defendant. [326]

INDICTMENTS found and returned in the Superior Court Department on December 5, 1980.

A pretrial motion was heard by *Augustus F. Wagner, Jr.,* J., and the cases were tried before *Robert S. Prince,* J.

*Paul W. Patten* for the defendant.

*Dana A. Curhan,* Assistant District Attorney, for the Commonwealth.

GRANT, J. The defendant has appealed from convictions by a jury on indictments charging him with kidnaping (G. L.

c. 265, § 26), assault and battery (G. L. c. 265, § 13A) and aggravated rape (three counts) (G. L. c. 265, § 22[a]).[1] Only two questions need be considered.

1. The complainant, when age sixteen, and the defendant, when twenty-eight, had formed an intimate relationship some three years prior to the date of the offences alleged, which was November 23, 1980. The relationship ultimately appeared to sour, and the two had seen each other only once, in a public place during the five months preceding November 23. In the early morning of that day the complainant entered the defendant's car, which was then left in front of her home. She was in his company for the next several hours, either in the car or in a motel until the police arrested him on an outstanding warrant for an unrelated offence. Within hours of the arrest the complainant gave the police a three-page handwritten statement which contained a completely innocuous account of the time she had spent with the defendant. Three days later, on November 26, the complainant gave the police a ten-page handwritten statement which accused the defendant of all the offences for which he was indicted.[2] The indictments were returned on December 5, 1980.

The complainant refused to discuss the case with the prosecutor. It should have been obvious to anyone familiar with the case that it was going to turn on the question whether the complainant had consented to go with the defendant and to the various sexual acts which had occurred. On May 26, 1981, the prosecutor filed a motion for a pretrial voir dire "with regard to the voluntariness of the victim's testimony." The

[1] The defendant was also convicted on a companion indictment for threatening bodily harm (G. L. c. 275, §§ 2 & 4) which was placed on file with the defendant's consent and which is not before us. *Commonwealth v. Delgado,* 367 Mass. 432, 437-438 (1975).

[2] For some reason which was never explained, the police kept the first statement to themselves, and it did not come to light until the third day of trial, when it was discovered during the cross examination of the complainant. The second statement was edited slightly by the complainant, typed by the police on eight pages, and signed by the complainant on December 2, 1980. The first statement and both versions of the second statement were received in evidence at trial.

motion was accompanied by something styled an affidavit[3] in which the prosecutor asserted that the complainant had indicated to him a week after the return of the indictments that she did not wish to testify against the defendant because she feared for her life and that she had reiterated her reluctance and fear within the previous ten days. The motion was anomalous at best. There was no suggestion that the complainant had or might assert any privilege not to testify. Constrast *Commonwealth* v. *Funches,* 379 Mass. 283, 287 (1979); *Commonwealth* v. *Collett,* 387 Mass. 424, 425 (1982); *Commonwealth* v. *Kane,* 388 Mass. 128, 135 (1983); *Commonwealth* v. *Borans,* 388 Mass. 453, 455 (1983); *Commonwealth* v. *Labbe,* 6 Mass. App. Ct. 73, 79 (1978). There was no request for any form of relief on the face of the motion, but it requires little imagination to conclude that the prosecutor was asking the court to intercede with a recalcitrant witness.

The motion was heard the day it was filed. The prosecutor called the complainant to the stand. After a few preliminary questions, he put the eight-page statement (see note 2, *supra*) before the complainant and had her read it to herself. He then proceeded to ask whether she had told the police certain of the things recited in the statement. She consistently answered in the affirmative. When counsel for the complainant and counsel for the defendant objected to that process, the judge advised that he was going to admit the statement as an exhibit for the purposes of the hearing and that the prosecutor would be allowed to question the complainant "on the entire events of the evening in question." The prosecutor then switched to asking the complainant whether certain of the things recited in the statement had in fact happened. Counsel for the defendant objected on the ground that what might have happened was irrelevant to the question of the voluntariness of the anticipated testimony of the complainant at trial. The judge ignored the objection[4] and then proceeded to ask the complainant a series

---

[3] The document was not sworn to, nor did it contain a statement that it was signed under the pains and penalties of perjury. See *O'Brion, Russell & Co.* v. *LeMay,* 370 Mass. 243, 245 (1976).

[4] It should be apparent to anyone who reads the transcript that the judge would not have tolerated any further objection by the defendant. When

of questions as to the respects in which the statement differed from what had happened. She, by unresponsive answers, attempted to suggest that the statement was incomplete in the sense that it contained nothing on the question whether she had consented to the defendant's advances. For instance: "I could have fought harder and prevented the rape;" "[B]efore we got to the motel, he told me that I could leave;" "I didn't call the police. They were just there when I left [the motel];" and "In every case I was the one to take my clothes off. But everything else is true."

After a few more questions by the prosecutor as to some of the sordid details of the evening, he finally got to the ostensible purpose of the hearing. He inquired whether the complainant's reluctance to testify was prompted by fear of the defendant, which she denied. The following sequence occurred: "Q. Your family is afraid of him? A. They have nothing to fear. Q. As long as you don't testify, right? A. No. Your Honor, the reason why I am not testifying against Bobby Ragonesi is because we're back together, and I don't want to testify against him for that reason. We've been seeing each other. THE COURT: All right go on with the questions, Mr. Turcotte." On cross examination the complainant's counsel brought out that there had been a reconciliation between the complainant and the defendant some three weeks earlier. She steadfastly disavowed any fear of the defendant. On redirect examination by the prosecutor, the complainant remembered that when she had talked with him following the return of the indictments, he had told her that "Ragonesi had never been convicted of anything because all the witnesses had always failed to testify."

At that point the judge took the bit in his teeth. The next twenty-three pages of the transcript are taken up by the judge's cross examination of the complainant. See *Commonwealth* v. *Campbell*, 371 Mass. 40, 45 (1976) ("We are not unmindful of the observation of Francis Bacon on the 'overspeaking judge,' and we have not favored except in extenuating cir-

counsel for the complainant inquired whether she might be permitted to reread the statement, the judge responded: "If she can't recall it, counsel. Be seated." If there were any question about a failure to object, we would overlook it under such cases as *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), and *Commonwealth* v. *Daigle*, 379 Mass. 541, 549 (1980).

cumstances the takeover of questioning by a judge during the course of trial"). Some of the questions, but not many, were concerned with whether the complainant's anticipated testimony would be voluntary. At one point the judge asked her if her counsel had advised her about contempt and perjury. See *Webb* v. *Texas,* 409 U.S. 95 (1972); *United States* v. *Hill,* 332 F.2d 105, 106-107 (7th Cir. 1964); *Berg* v. *Morris,* 483 F. Supp. 179, 182-184 (E.D. Cal. 1980), and cases cited. Twice the judge inquired whether the complainant had lied to the police when she gave them the eight-page statement. More important, for present purposes, the judge questioned the complainant at length on the minutest details of some of the sexual acts alleged. Before long the complainant was agreeing with the judge that practically everything recited in the statement was true and that she had not consented to any of the acts in question.[5]

At the conclusion of the hearing the judge ordered the case to trial the following Monday, first case out. At trial, before a different judge, the prosecutor led the complainant right down the line on the truth of virtually everything recited in the eight-page statement. The defendant fled prior to the conclusion of her testimony. He was not apprehended and sentenced for more than three years.

We see no point in extended discussion. The motion judge's questioning was both excessive and inexcusable. Compare *Commonwealth* v. *Sneed,* 376 Mass. 867, 869-870 (1978). The prosecution went into the voir dire hearing with a lengthy, unsworn statement of the complainant which it could use not only to refresh her recollection but also to impeach her by prior inconsistent statements. On the other side of the pit, the defendant had the apparent advantage of a change of heart and mind on the part of the complainant so far as the question of consent was concerned. Although he did not know it at the time, he also had the benefit of a prior consistent statement (the original three-page statement to the police) with which to rehabilitate the complainant against a claim of recent contrivance. See *Commonwealth* v. *Saarela,* 376 Mass. 720, 722-723 (1978); *Commonwealth* v. *Haywood,* 377 Mass. 755, 762-763 (1979). The prosecution came out of the hearing with a

_____

[5] The salient features of the judge's interrogation appear in the Appendix to this opinion.

thoroughly coerced witness who would be understandably reluctant to go back on the sworn testimony she had given to a judge of the Superior Court. The prosecution also came out with a transcript of proceedings which could be used for the same purposes as the eight-page statement but which bore an increased aura of authenticity and might well be admissible in evidence for the truth of the matters contained therein if the witness should bolt or balk at trial.[6] See *Commonwealth* v. *DiPietro,* 373 Mass. 369, 375-386 (1977); *Commonwealth* v. *Canon,* 373 Mass. 494, 499-501 (1977), cert. denied, 435 U.S. 933 (1978); *Commonwealth* v. *Ortiz,* 393 Mass. 523, 531-535 (1984); *Commonwealth* v. *Trigones,* 397 Mass. 633, 637-638 (1986). The defendant came out of the hearing with little but the opportunity to offer the original three-page statement as a prior inconsistent statement.

The Commonwealth suggests that the defendant was not harmed because the interrogation complained of did not take place within the presence of the jury. The suggestion overlooks the fact that the jurors were unaware of the earlier voir dire and had no opportunity to judge for themselves whether the witness had been intimidated into saying or not saying something that might or might not have come out if the questioning had been left to opposing counsel. More significant, perhaps, there was no practical way in which the trial judge could alleviate the hidden damage by curative instructions such as are customarily given whenever there is a possibility that he (the trial judge) may have gone too far in questioning a witness.[7] Contrast *Commonwealth* v. *Oates,* 327 Mass. 497, 499-500 (1951); *Commonwealth* v. *Leventhal,* 364 Mass. 718, 723-724 (1974); *Commonwealth* v. *Festa,* 369 Mass. 419, 423 (1976); *Commonwealth* v. *Campbell,* 371 Mass. at 45; *Commonwealth* v. *Dias,* 373 Mass. 412, 415-417 (1977); *Commonwealth* v.

---

[6] The complainant did attempt to invoke the privilege against self-incrimination at trial on the ground that further testimony on her part would subject her to charges of perjury in her testimony before the motion judge. The trial judge, after a further voir dire, ordered the victim to testify to all the events in question. The propriety of that order is not before us.

[7] The trial judge had the transcript of the proceedings on the earlier voir dire.

*Fitzgerald,* 380 Mass. 840, 847 (1980); *Commonwealth* v. *Rogers,* 8 Mass. App. Ct. 646, 650-651 (1979).

2. The defendant moved in advance of trial for permission, under G. L. c. 233, § 21B, to introduce evidence of specific instances of the complainant's prior sexual conduct with the defendant. The motion asserted that there had been a long-term sexual relationship between the complainant and the defendant, as well as numerous prior instances of vaginal and oral sex committed in the presence of others, in an automobile, in motels, in the home of the complainant's parents and in the defendant's place of residence. The trial judge denied the motion as framed but did permit a broad range of general questions, on the cross examination of the complainant, as to whether she and the defendant had lived together "as man and wife" and as to whether she had been intimate with him, had traveled to Las Vegas with him, had stayed with him in a trailer in which he had lived while working in Boston, and had lived with him for a period in another trailer which had been parked in the back yard of some of his relatives. The judge acted well within the bounds of the discretion which is committed to him under § 21B. Compare *Commonwealth* v. *Mosby,* 11 Mass. App. Ct. 1, 13 (1980).

3. None of the other questions which have been argued is likely to arise at a further trial.

The judgments on indictments nos. 7265, 7266 (all three counts) and 7267 are reversed, and the verdicts on those indictments are set aside.[8]

*So ordered.*

---

[8] The defendant, on request made to the Superior Court within thirty days from the date of this opinion, may also have a new trial on the indictment (no. 7268) for threatening bodily harm. Compare *Commonwealth* v. *Nowells,* 390 Mass. 621, 630 (1983). See also *Commonwealth* v. *Chappee,* 397 Mass. 508, 523 (1986).

APPENDIX.

Q. And in the car, when he put his finger in your vagina, did you agree to that? Did you submit to that or was that something that you didn't want him to do, as indicated in the statement?

A. In the car, I didn't want him to do it.

Q. All right. You said you were screaming and tried to pull his hands away. Is that true?

A. Yes.

Q. That you tried to cover yourself up; is that true?

A. Yes.

Q. You asked him if you could put your clothes back on; is that true?

A. Yes.

Q. You kept crying and saying that you wanted to be brought home?

A. Yes.

Q. You didn't want him to do anything. You said, "No, no, please bring me home." Is that true?

A. Yes.

Q. Did you say that he got mad that you were crying and grabbed his penis and put it in your mouth?

A. Yes, your Honor.

Q. Did you want him to do that then —

A. No.

Q. — in the car?

A. No.

Q. That you were gagging; is that true?

A. Yes.

Q. And you say that he made you lay back — lie down on the front seat on your back; is that true?

A. He told me to and I did.

Q. You say that he pulled your legs apart; is that true?

A. Yes, at that time.

Q. That he put his penis in your vagina; is that true?

A. Yes.

Q. Did you agree to that at that point?

A. Not in the car, no.

Q. All right. You indicate that he pried your mouth open so that he could put his tongue in it. Is that true? That you were still crying.

A. I was.

Q. That you kept asking at this time to take you home. You said, "I did what you wanted, now please bring me home." You wanted to put your clothes on; is that true?

A. Yes.

Q. He asked you to go to a motel, and you said that you didn't want to go to a motel; is that true?

A. Yup.

Q. He took you to a phone in Zayre's parking lot, and that it was dark; is that true?

A. Yes.

Q. All right. And he stated to you that it was cold and dark and nobody was around to help you; is that true?

A. I knew that.

Q. I'm not asking you whether you knew it. In your statement, you said that he told you that. Is that true?

A. Yes.

Q. What was your state of mind at that time?

A. I just wanted to go home at that time. I thought that if I could just talk to him and get him to calm down and sober up a little bit, that he would realize what he was doing.

Q. Were you in fear?

A. No, not at that point I wasn't.

Q. Were you in fear at any time during the course of the evening?

A. Yes, I was.

Q. When?

A. I was in fear when I found that I couldn't get out of the car. And I was in fear when we were in the woods, and I was . . .

Q. Well, you say here that you were crying at the time that you were at the Zayre's parking lot. Were you?

A. A little.

Q. Was there something that caused you to be crying? Why were you crying?

A. Because I wanted to go home and I was cold, and I was a little bit afraid.

Q. All right. And you say that you tried to open the door and he grabbed you by the arm and put the car in drive and left; is that true?

A. Yes.

Q. You tried to shut the car off; is that true?

A. Yes.

Q. Did you try to jump out of the car?

A. Well, I tried to open the door and act as though I was jumping out so he would stop it.

Q. And you told the police in this statement, at least, it's alleged that you said, "I tried to jump out, but the car was moving already and I was afraid." Is that true? Was that your state of mind at that time?

A. Yes.

Q. He kept driving?

A. Yes, he did. He just — we were talking at the same time.

Q. You indicate in your statement that you were screaming.

A. Well, I was aggravated — screaming not out of fear; out of anger at that time just for him to listen to me and to what I had to say.

Q. You asked him to bring you home?

A. After a little while, when I knew where we were going.
Q. You went to the Capri Motel?
A. Yes, we did.
. . . .
Q. You state, according to this statement, that he put his arm around you and pushed you into the room. Did he push you into the room?
A. No, he didn't push me.
Q. Well, is that what you said? Is that what you told the police that night — fourth line up [indicating]?
A. Yes. That's what I told them.
Q. So that's not true? You were lying then? Is that what you're telling us?
A. No.
Q. Well, is that true or not?
A. He didn't literally push me in.
Q. What did he do?
A. He had his arm around me, and we walked in.
Q. Did you want to go in the room?
A. No, not really.
Q. Is it true that you had indicated that you wanted to go home.
A. Yes.
Q. Did he tell you take your clothes off?
A. He asked me.
Q. And did you begin to cry and say, "No, not again"?
A. Yes.
Q. Is that true?
A. Yes.
Q. Did you go to the bathroom to try to find a way to get out of the motel room?
A. Yes, I did.
Q. Did you try make up an excuse for not getting undressed?
A. Yes.
Q. What type of excuse did you try to make up?
A. I told him that it was cold — and it was — and that I just didn't want to get undressed; that I would rather just talk about it and wait until he gets sober.
Q. Did he try to put his penis in your mouth again?
A. Yes.
Q. Did he say to you to put it in your mouth, and if not you'd be sorry? Did he state that to you?
A. [No response]
Q. Did you tell the police that?
A. Yes, I did.
Q. Is that true or false? Did that happen?
A. He didn't tell me that I would be sorry.
Q. What did he say?
A. He just said, "Take it."

Q. Well, what did he say? Did you tell the police that he said you'd be sorry? What did you mean by that when you told the police that?

A. I meant that I was just — I did what he wanted me to do.

Q. Well, did you do it because you wanted to please him? Did you do it because you wanted to participate with him in these sexual acts, or did you do it because, as you indicated here, "I was very afraid of him because he was drunk, so I put his penis in my mouth"? Is that what happened? Was that your state of mind at that time?

A. He was drunk, but I did it because I felt that — he had asked me before, and I didn't put this in the statement, but if I would just go with him one more time for old times' sake, and I said yes. But when he drinks, I just, you know, I don't like to talk with him when he drinks.

Q. Well, were you telling the truth when you said, "I was afraid of him because he was drunk, so I put his penis in my mouth," or were you lying?

A. I was telling the truth.

. . . .

Q. Then he put his penis in your hand and said, "Put it in." Does that state it?

A. Yes.

Q. And you cried; is that right?

A. A little.

Q. And you said, "No, no, no. Please don't make me do it." Is that true?

A. I said that —

Q. And that he then did it himself; is that correct?

A. No, I did it.

Q. So it's incorrect, this statement that he did it himself:

A. Yes, it is.

Q. Did he hold you by the face and say, "You tell your boyfried that this is from me to him"? Did he say that to you?

A. Yes, he did.

Q. And at that time he caused some injuries by the use of his mouth on your neck and your breasts; is that correct?

A. Yes.