## Commonwealth *vs.* Bryan J. Hassey.

No. 95-P-1201.

Plymouth. May 20, 1996. - July 24, 1996.

Present: KASS, JACOBS, & FLANNERY, JJ.

*Practice, Criminal,* Questioning of witness by judge. *Evidence,* Questioning of witness by judge. *Witness,* Credibility.

The judge at a rape trial erred in questioning a defense witness at the end of recross-examination with respect to the witness's failure to have gone to the police with his information, where there was no foundation in the record for such inquiry and where the judge's sharp examination of the witness went beyond the scope of mere clarification: the error was not harmless where the effect of the inquiry reflected on the witness's credibility and credibility was the main issue at trial. [810-812]

INDICTMENT found and returned in the Superior Court Department on January 20, 1993.

The case was tried before *Cortland A. Mathers,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services (*Michele L. Keno,* Committee for Public Counsel Services, with him) for the defendant.

*Mary E. Mullaney,* Assistant District Attorney, for the Commonwealth.

KASS, J. Following recross-examination of a defense witness by the prosecutor, the trial judge launched into a penetrating examination of that witness about why he had not previously gone to the police with his exculpatory information. By the time the judge had done with the witness, it was likely he left the impression with the jury that he thought the witness a liar. It was error on the part of the judge to have conducted the examination because an insufficient basis had been established for it and because the examination exceeded what are generally the limits for judicial intervention in the questioning of witnesses. In the context of the

entire record of the trial, we do not think the error was harmless and we, therefore, reverse the defendant's conviction of rape.[1]

Bryan J. Hassey, the defendant, was charged with the rape of the victim, whom we shall call Myra, in her home on the morning of November 7, 1992. Hassey's defense was that their sexual encounter was consensual and affectionate, consistent with previous meetings. Myra's version of the events was that the only consistency was that the defendant had already once — during the previous August — forced himself on her, although she had chosen on that occasion not to lodge a complaint against him.

The Commonwealth's case rested primarily on: (a) the testimony of Myra and (b) the observations and fresh complaint testimony of (i) the police officer who responded to a call from Myra, (ii) a nurse on the rape crisis team at South Shore Hospital who treated Myra, and (iii) a rape investigator for the Hull police department. There was physical evidence such as a torn nightshirt and photographs of a seriously disordered bathroom (that was the room in which the sexual act took place) from which the jury could infer that what had occurred between Myra and Hassey had been tumultuous. In response, the defense paraded a series of witnesses who testified to a cordial relationship between the complainant and the defendant. Hassey took the stand in his own behalf to so state and to meet the torn clothing and damaged bathroom evidence with the explanation that it reflected his and Myra's exuberant passion. Several defense witnesses testified as well to expressions of ire with Hassey on Myra's part because he had ruined the engine in her car. He had promised to pay for repairs but had failed as persistently to produce any money as he had vowed so to do. The defense strategy was to establish that Myra harbored a bias against Hassey for that reason and to have the jury draw the inference that Myra had contrived the charge of rape as an act of vengeance.

One of the witnesses called to so testify was Leonard Spurrell, who had worked with both Myra and Hassey and was a friend of Hassey's of twelve years' standing. On direct

[1]The judge on June 30, 1994, imposed a sentence of twenty years in M.C.I., Concord. The defendant would be eligible for parole after two years of incarceration.

examination, Spurrell claimed personal knowledge of multiple acts of sexual intercourse between Myra and Hassey and that Myra had told him, Spurrell, that because she had not received any money from him "she would try to get him any way possible she could." Cross-examination, redirect examination, and recross-examination that followed was devoted to probing inconsistencies or papering them over, depending on whether the prosecutor or defense counsel was the interrogator. When those rounds of questioning had concluded, the trial judge, over the objection of defense counsel, proceeded on a line of inquiry that the prosecutor had not followed. To convey the flavor of the judge's examination of Spurrell, we set it out in full:

> THE COURT: "I have a couple of questions, Mr. Spurrell. You have been friendly with this defendant for ten or twelve years; is that right?"
>
> THE WITNESS: "Yes."
>
> THE COURT: "He's one of your best friends?"
>
> THE WITNESS: "Yes."
>
> THE COURT: "When you learned he was accused of — when did you learn he was accused of rape?"
>
> THE WITNESS: "I think it was August. I hadn't seen him for a while."
>
> THE COURT: "Did you go to see him right away after that?"
>
> THE WITNESS: "He was in prison."
>
> THE COURT: "Well, did you get in any contact with him?"
>
> THE WITNESS: "No, I didn't."
>
> [DEFENSE COUNSEL]: "Judge, may we be heard."

THE COURT: "Have you been in contact with him since that time?"

THE WITNESS: "Yes."

THE COURT: "When did you get in contact with him for the first time?"

THE WITNESS: "Probably two or three weeks after he was released on bail."

THE COURT: "And when was that?"

THE WITNESS: "I don't recall the date."

THE COURT: "Well, did you talk with him about this serious charge?"

THE WITNESS: "He told me what he was being charged with here."

THE COURT: "You heard about what he was being charged with before he told you?"

THE WITNESS: "Yes."

THE COURT: "And what did you do when you heard about that charge?"

[DEFENSE COUNSEL]: "Objection, your Honor."

THE WITNESS: "Nothing."

THE COURT: "You didn't do a thing?"

THE WITNESS: "No, I didn't."

THE COURT: "You didn't go down to the Hull Police Department and say, My friend is wrongfully charged with rape and the woman that's charged him with rape has said she wants to get even with him?"

THE WITNESS: "No."

THE COURT: "Objection is noted."

The judge thought Spurrell was lying and said as much at sidebar shortly after this interrogation.

Of course a trial judge may question witnesses to clarify the evidence, eradicate inconsistencies, avert possible perjury, and develop trustworthy testimony. *Commonwealth* v. *Festa,* 369 Mass. 419, 422-423 (1976). *Commonwealth* v. *Dias,* 373 Mass. 412, 416-417 (1977). *Commonwealth* v. *Paradise,* 405 Mass. 141, 157 (1989). *Commonwealth* v. *Jiminez,* 22 Mass. App. Ct. 286, 292-293 (1986). In exercising their duty to direct and clarify the evidence, judges may not, however, weigh in, or appear to do so, on one side or the other; the judge must avoid the appearance of partisanship. *Commonwealth* v. *Festa, supra* at 422. *Commonwealth* v. *Campbell,* 371 Mass. 40, 45 (1976). *Commonwealth* v. *Marangiello,* 410 Mass. 452, 461 (1991). The rule is one of reason. *Commonwealth* v. *Campbell, supra* at 45. *Commonwealth* v. *Dias, supra* at 416. "[E]xtensive examination of witnesses by the judge during trial is not to be encouraged. [Citation omitted.] The possibility of prejudice arises especially in a criminal case where the judge's questions may unintentionally have the effect of impeaching the defendant or defense witness." *Commonwealth* v. *Fitzgerald,* 380 Mass. 840, 847 (1980). For ostentatious stepping over the line, see *Commonwealth* v. *Sneed,* 376 Mass. 867, 867-871 (1978), and *Commonwealth* v. *Ragonesi,* 22 Mass. App. Ct. 320, 323-326 and Appendix at 327 (1986).

In comparison with the judicial forays in *Sneed* and *Ragonesi,* the judge's examination of Spurrell was less egregious. Yet it went beyond clarification or straightening out of seemingly errant testimony. The advocates for both sides had finished with what they wanted to ask of Spurrell and the evidence he gave was not confusing. The prosecutor had probed inconsistencies and had done what he could to cast doubt on the trustworthiness of Spurrell's testimony. The judge's questioning could be perceived as having the effect of destroying Spurrell's credibility in the minds of the jurors, producing the very result that the *Fitzgerald* opinion says ought to be particularly avoided. That it was the judge who may have

caused Spurrell to unravel as a credible witness made that unravelling doubly effective because jurors are likely to pick up signs from the judge about what the judge thinks of the credibility of a witness or party. See *Commonwealth* v. *Hanscomb,* 367 Mass. 726, 732 (1975)(Hennessey, J., concurring).

Sometimes a judge who examines a witness at greater length and more sharply than is prudent can neutralize the damaging effects by instructing the jury that they should draw no inferences, let alone conclusions, from the circumstance that it was the judge who asked certain questions of a witness. See *Commonwealth* v. *Festa,* 369 Mass. at 423; *Commonwealth* v. *Campbell,* 371 Mass. at 45. Here, the judge said nothing in his instructions that dulled the sting of his examination of Spurrell.

Not only was the judge's examination of the defense witness a too partisan entry on the side of the prosecution, see *United States* v. *Marzano,* 149 F.2d 923, 926 (2d Cir. 1945), but the basis for the inquiry of Spurrell was mistaken because the foundation required by *Commonwealth* v. *Brown,* 11 Mass. App. Ct. 288 (1981), was not present, or at least had not been established. Although a citizen is not legally bound to make exculpatory evidence known to the police or district attorney, *id.* at 295, and *United States* v. *New York Tel. Co.,* 434 U.S. 159, 175-176 n.24 (1977), there are circumstances in which the failure to communicate evidence to the police — an alibi is a good example — may cast doubt on the credibility of the witness who produces that exculpatory evidence for the first time at trial. *Commonwealth* v. *Brown,* 11 Mass. App. Ct. at 295-296.

We said in *Brown* that the "failure to go to the authorities" line of inquiry must be handled with caution and we laid down guidelines for doing so. Those guidelines require that the prosecutor first establish: 1) that the witness knew of the pending charges in sufficient detail to realize that he possessed exculpatory information; 2) that the witness had reason to make the information available; 3) that the witness was familiar with the means of reporting the exculpatory information; and 4) that the defendant or the defendant's lawyer had not asked the witness to refrain from reporting the exculpatory information to the authorities. Accord *Commonwealth* v. *Berth,* 385 Mass. 790-791 (1982). *Commonwealth* v. *Egerton,* 396 Mass. 499, 507 (1986). The judge's questions did not

solicit information bearing on points (3) and (4), and it is far from clear that Spurrell would understand that he possessed exculpatory information. The significance of bias as a defense tool is not necessarily common knowledge, and Spurrell may well have neither appreciated the significance of the grievance to which he said Myra had given voice nor known what do do with that information. See *Commonwealth* v. *Bassett*, 21 Mass. App. Ct. 713, 716-717 (1986); Compare *Commonwealth* v. *Lopes*, 34 Mass. App. Ct. 179, 181-182 (1993). The point of the judge's examination of Spurrell was not lost on the prosecutor. Thereafter he routinely inquired of defense witnesses why they had not previously spoken to the authorities about the information to which they had just testified.

In his summation, the prosecutor said nothing of Spurrell or any other witness not having gone to the authorities before. One needs to ask if, in the end, the judge's inadequately founded and too partisan questioning may have been harmless. We do not think so. As so often in the trial of a charge of rape, there was a contest of credibility between accuser and accused. No other witnesses observed the event inside Myra's residence. By damaging the credibility of a moderately important witness for the defense (the jury might not be likely, for example, to give much weight to the exculpatory testimony of Hassey's mother), the credibility of the over-all defense would have sustained damage. This problem became more acute later in the case when Myra, recalled to the stand, testified that Spurrell had told her that the man who employed him and her was "paying him money to testify." To the degree the judge had been successful in undoing Spurrell's credibility in the eyes of the jurors, the credibility of Myra was reciprocally enhanced. Although the prosecution's case was substantial, we are unwilling to speculate that the jury were not influenced by the judge's examination of Spurrell and we conclude that the judgment must be reversed.

Should there be a retrial, Myra ought not to be permitted to testify about what her guest Gary Stewart said after she complained to him about Hassey's forcing himself on her in August. That was hearsay which fit into no category of exception.

*Judgment reversed.*

*Verdict set aside.*