## COMMONWEALTH vs. SAMUEL WATKINS.

No. 03-P-1398.

Plymouth. October 28, 2004. - March 3, 2005.

Present: ARMSTRONG, C.J., DREBEN, & KATZMANN, JJ.

*Assault with Intent to Murder. Firearms. Practice, Criminal,* Questioning of
   witness by judge.

At a jury-waived criminal trial, the judge's questioning of a Commonwealth
   witness did not exceed the proper scope of questioning, in violation of the
   defendant's right to due process under art. 12 of the Massachusetts Declara-
   tion of Rights and the Fourteenth Amendment to the United States Constitu-
   tion, where the judge's questioning was brief and straightforward, the
   questions had the effect of clarifying and expanding upon the witness's
   physical position and his ability clearly to observe and identify the
   defendant, and whatever weight the judge gave to the witness's testimony
   was exclusively within her province as the fact finder. [72-75]

INDICTMENTS found and returned in the Superior Court Depart-
ment on October 30, 2001.

The cases were heard by *Carol S. Ball,* J.

*Nona E. Walker,* Committee for Public Counsel Services, for
the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the
Commonwealth.

KATZMANN, J. The defendant was charged in 2001 with armed
assault with intent to murder and unlawful possession of a
firearm. He elected to be tried without a jury, and was convicted
in Superior Court of both charges. On appeal, the defendant
argues that the trial judge's questioning of a Commonwealth
witness exceeded the proper scope of questioning, in violation
of his right to due process under art. 12 of the Massachusetts
Declaration of Rights and the Fourteenth Amendment to the
United States Constitution. We affirm.

*Background.* The charges against the defendant arose out of a

shooting incident outside a nightclub in Brockton. The facts relevant to this appeal are that, as the shooter was firing into a crowd on the street outside the club shortly after midnight on September 2, 2001, Scott Uhlman, an off-duty Brockton police officer, was driving by in his truck. As Uhlman was proceeding, he drove parallel and in close proximity to a man, whom he later identified as the defendant. He observed this man firing four rounds from a revolver in the direction of people on the street. Uhlman pulled over some distance up the street, radioed for back-up, and watched the shooter flee the scene, then reverse course and go behind the nightclub. The shooter was observed a short distance away by another police officer, Shawn Baker, who had responded to Uhlman's radio call, in a location consistent with the place where Uhlman had lost sight of the shooter. Baker saw the shooter walk behind a set of shrubs, where he remained for thirty to forty-five seconds. Baker radioed back-up officers that he had the suspect in view, and after the back-up arrived, the shooter was apprehended. Uhlman arrived shortly thereafter and identified the defendant as the shooter. A .38 caliber handgun, which appeared to have been recently fired, was found under the shrubs where Baker had observed the defendant. There were five spent shells found in the gun. A bullet recovered from a man who had been shot three times outside the club during the shooting incident was also determined to be .38 caliber, although there were insufficient markings to make a positive identification with the gun found under the shrubs.

Uhlman testified that he did not see the shooter's face at any time during the pursuit, but observed him through the vehicle's rearview mirror as Uhlman pulled over to the side of the road. Uhlman's report of the incident described the shooter as tall, wearing a black jacket with a red stripe across the back and a black "do-rag." When the defendant was apprehended he was wearing a jacket with a reflective gray stripe across the back and a red "do-rag" under a fitted baseball cap. Uhlman testified that when he positioned the jacket with the brake lights from his truck shining on it, the reflective stripe appeared red in the rearview mirror.

After cross-examination of Uhlman, the judge asked him the

following series of questions on which the defendant bases his appeal:

> JUDGE: "Officer, you seem to me pretty certain of your identification; is that fair?"
>
> WITNESS: "Yes."
>
> JUDGE: "And yet you saw him only from the back?"
>
> WITNESS: "Absolutely. That's correct, your Honor."
>
> JUDGE: "And why — can you tell me why you're so certain of your identification without having seen his face?"
>
> WITNESS: "Well, your Honor, first, he was standing next to me —"
>
> JUDGE: "Yeah."
>
> WITNESS: "— this far away [indicating]."
>
> JUDGE: "Okay."
>
> WITNESS: "I'm driving, and when he takes his first shot —"
>
> JUDGE: "Okay. If I'm — if I'm you, I'm driving, —"
>
> WITNESS: "Okay."
>
> JUDGE: "— at what angle are you?"
>
> WITNESS: "Just — you face that way, —"
>
> JUDGE: "Okay."
>
> WITNESS: "— and this is the first shot that I see."
>
> JUDGE: "Okay."
>
> WITNESS: "And I see the back of the jacket, —"
>
> JUDGE: "Uh-huh, and the back of the head."

WITNESS: "And I — I see fire coming out of the tip of his
    finger."

JUDGE: "Okay."

WITNESS: "So that's when I take my gun out, —"

JUDGE: "Right."

WITNESS: "— try to get my seatbelt off, call in on the
    radio."

JUDGE: "Right."

WITNESS: "I pull ahead out — ahead of him a little bit."

JUDGE: "Yeah."

WITNESS: "I look in my rearview mirror, I step on my
    brakes. The jacket lights up red. I'm looking
    right through my rearview mirror. He fires three
    more shots, for a total of four shots."

JUDGE: "Uh-huh."

WITNESS: "I'm trying to get away from him because he's
    running up Green Street that way. That's when I
    turn and go to the front of the credit union, and
    that's when he realized he has no avenue of
    escape and decides to run in the opposite
    direction. When I got around the corner there
    was no question in my mind, as well as I know
    my sister, that that was the man that I saw in
    my rearview mirror. That's it."

*Discussion.* As an initial matter, we note that the defendant
failed to object to the judge's questioning or the testimony
elicited. The Commonwealth urges that we apply the stricter
standard of review usually appropriate where no objection is
made: whether the questioning was error, and if so, whether that
error created a substantial risk of a miscarriage of justice. See,
e.g., *Commonwealth* v. *Mazzone*, 55 Mass. App. Ct. 345, 348
(2002). The defendant asserts that in a jury-waived trial, where
the judge alone decides the defendant's fate, delicate conditions

of the relationship between counsel and the court absolve counsel from making objections to judicial conduct of proceedings. We are unpersuaded by this argument, and see no reason to depart from the substantial risk of miscarriage of justice standard. In any event, there was nothing improper about the judge's questioning.

The obligation to object in a timely fashion not only protects the interests of a party, but it also promotes interests of judicial economy. See generally *Commonwealth* v. *Alphas*, 430 Mass. 8, 22 (1999) (Greaney, J., concurring). Thus, for example, alerting the trial judge to an error may enable the judge promptly to correct the error, and may render unnecessary further proceedings or litigation on the issue. *Ibid.* Accordingly, it is well established that in both jury trials, see, e.g., *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967), and jury-waived trials, see, e.g., *Commonwealth* v. *Mazzone*, *supra*, counsel have an obligation to make timely objections, and failure to do so will limit review to whether the error, if any, created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Gomes*, 54 Mass. App. Ct. 1, 5 (2002). In jury trials, where counsel have not objected to judicial questioning, counsel have on occasion claimed reluctance to antagonize the jury, perhaps for fear of being perceived as obstructionist or disrespectful to the court. Cf. *id.* at 5 n.5. Notwithstanding the fact that the jury may be unaccustomed to the sometimes combative world of the adversary process, we have ruled that such inaction by counsel is not justifiable, and will trigger only limited appellate review. *Ibid.* "While we understand the natural reluctance of trial counsel to object to questions . . . coming from a judge, sometimes trial counsel's duty to protect his client's rights requires him to object, preferably at the bench out of the jury's hearing." *Ibid.*, quoting from *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 846 (1980). See *Commonwealth* v. *Jiminez*, 22 Mass. App. Ct. 286, 292 n.5 (1986). In a jury-waived trial, such concerns of overstepping appropriate bounds are even less availing. A judge, unlike a jury, is schooled in the dynamics of the adversary process, and understands that this process contemplates vigorous engagement by counsel, who, indeed, are officers of the court. Objections posed to the trial judge do not

reflect personal disagreement, but are manifestations of respect for the judge's role as the "guiding spirit and the controlling mind at a trial." *Id.* at 292, quoting from *Commonwealth* v. *Dias*, 373 Mass. 412, 416 (1977). Accordingly, counsel's failure to object to judicial conduct in a jury-waived trial will result in review of an untimely asserted error under a substantial risk of justice standard. *Commonwealth* v. *Gomes, supra* at 5.

The defendant's claim here of improper judicial questioning, when considered under any standard, is unpersuasive. It is well established that a judge in this Commonwealth may question witnesses to clarify and develop evidence and to avert perjury. See *Commonwealth* v. *Dias, supra* at 416-417; *Commonwealth* v. *Hassey*, 40 Mass. App. Ct. 806, 810 (1996). The jury may also put questions to witnesses for the purpose of better understanding the evidence, subject to the court's approval. *Commonwealth* v. *Britto*, 433 Mass. 596, 610-611 (2001). In certain limited instances, our appellate courts have held judicial questioning improper, either for its excess, see *Commonwealth* v. *Ragonesi*, 22 Mass. App. Ct. 320, 323-325 (1986) (twenty-three transcript pages of judicial questioning, mostly unrelated to the matter at issue in the hearing), or its lack of impartiality, see *Commonwealth* v. *Sneed*, 376 Mass. 867, 869 (1978) ("the jury were probably aware that the judge did not believe the witness"). However, the brief, straightforward questioning at issue in the case at bar bears no relation to the overreaching in those cases.

The defendant argues that the judge's questioning had the effect of soliciting statements as to the witness's degree of certainty regarding his identification, and notes that the Supreme Judicial Court has held that juries should not be instructed to give any weight to witness certainty or lack thereof. See *Commonwealth* v. *Santoli*, 424 Mass. 837, 845-846 (1997). The Supreme Judicial Court, however, has not precluded witness testimony regarding certainty, or prohibited counsel from probing the subject or arguing about it. *Commonwealth* v. *Zimmerman*, 441 Mass. 146, 153 n.5 (2004) (witness "testified that he knew 'with all [his] heart' that the defendants were the assailants"). See *Commonwealth* v. *Drane*, 47 Mass. App. Ct. 913, 914 (1999); *Commonwealth* v. *Cowans*, 52 Mass. App. Ct.

811, 814 (2001). The defendant's suggestion that the line of questioning and response was improper because it was elicited by the judge, and not by the attorneys, is a distinction of no consequence. In any event, the thrust of the judge's questions here were designed to elicit testimony about the *source* of the witness's certainty. That is, the judge's questions, on the whole, had the effect of clarifying and expanding upon the witness's physical position and his ability clearly to observe and identify the shooter — matters clearly relevant to the fact finder's determination of guilt or innocence. See *Commonwealth* v. *Cincotta*, 6 Mass. App. Ct. 812, 817, *S.C.*, 379 Mass. 391 (1979) (the assessment of the reliability of an identification is a question for the fact finder). That the witness responded to the judge's questioning with an assessment of his degree of certainty ("as well as I know my sister") is of no import. Whatever weight the judge did give to the witness's testimony was exclusively within her province as the fact finder. See *Commonwealth* v. *Moquette*, 439 Mass. 697, 702 (2003). We must assume that the judge did not give inappropriate weight to the witness's statement, because judges in jury-waived trials are presumed to know and correctly apply the law. See *Commonwealth* v. *Montanez*, 439 Mass. 441, 449 (2003).

Because we conclude that the judge's questioning of the witness was not improper, and thus did not create a substantial risk of a miscarriage of justice,[1] the judgments are affirmed.

*Judgments affirmed.*

---

[1] Even if there were error, the defendant concedes that, with the exception of the testimony regarding certainty, the witness's responses to the judge's questions were largely a reiteration of the witness's testimony during direct and cross-examination. The judge, moreover, observed that there was other evidence which buttressed the identification and supported the conviction, and that she was "quite comfortable" with her verdict.