Commonwealth *vs*. Reynaldo Alcedo Jiminez
(and five companion cases[1]).

Bristol.  November 13, 1985. — May 30, 1986.

Present: Grant, Kaplan, & Smith, JJ.

*Search and Seizure,* Automobile, Threshold police inquiry. *Practice, Criminal,* Questioning of witness by judge, Substitution of alternate juror, Indictment. *Jury and Jurors. Evidence,* Chain of custody. *Firearms.*

A police officer's action in positioning his cruiser so as to follow a short distance behind an automobile to observe its operation, which resulted in his observation that the validation sticker on the vehicle's license plate had expired, could not properly be characterized as pursuit and did not encroach upon any privacy interest of the occupants of the vehicle. [289-290]

A police officer who concededly had probable cause to search an automobile for weapons was entitled to extend his warrantless search to the trunk of the car after finding a firearm and contraband in the passenger compartment. [290-291]

At a criminal trial there was no error in the judge's questioning of two police witnesses for the purpose of clarifying matters relative to the admission of certain evidence, where neither officer was a witness to the crimes for which the defendant was on trial, where the testimony elicited was technical in nature, and where the judge instructed the jury to attach no significance to the fact that he had asked the questions. [291-293]

A judge did not abuse his discretion in discharging one of the jurors after the close of the evidence at a criminal trial so that she could attend an employment interview, and in substituting an alternate juror before deliberations had commenced. [293-295]

Any weakness in the chain of custody of a firearm admitted in evidence at a criminal trial affected the weight rather than the admissibility of that evidence. [295]

Evidence at a criminal trial was sufficient to establish beyond a reasonable doubt that the length of the barrel of a firearm was less than eighteen inches, where the weapon itself was placed in evidence and where two police witnesses described it as a "sawed-off shotgun." [295]

---

[1] Two of the companion cases are against Jiminez and three are against Jórge Mayans.

There was no merit to a defendant's contention that he was entitled to a required finding of not guilty on a criminal charge because a statutory citation in the indictment was typed incorrectly. [295-296]

INDICTMENTS found and returned in the Superior Court Department on September 28, 1983.

A pretrial motion to suppress evidence was heard by *Robert J. Hallisey, J.*, and the cases were tried before *Elbert Tuttle, J.*

*Richard P. Desjardins* for Jorge Mayans.

*Antone B. Cruz, Jr.,* for Reynaldo Alcedo Jiminez.

*Dana A. Curhan,* Assistant District Attorney, for the Commonwealth.

SMITH, J. The defendants, Reynaldo Alcedo Jiminez and Jorge Mayans, were indicted for (1) unlawfully carrying a firearm (a nine millimeter "Mac 10" weapon), (2) unlawful possession of an altered firearm (a sawed-off shotgun), and (3) unlawful possession of cocaine, with intent to distribute, said cocaine being in excess of 200 grams. Both defendants were convicted on all three indictments following a jury trial. On appeal, they allege several errors which they claim require reversal of their convictions.

1. *Denial of suppression motions.* Prior to trial, both defendants filed motions to suppress certain evidence that had been seized by the police as a result of a warrantless search of their automobile. After a hearing, a Superior Court judge denied their motions and filed a memorandum that contained his findings of fact. Those findings of fact are "binding in the absence of clear error . . . and [we] view with particular respect the conclusions of law which are based on them." *Commonwealth* v. *Correia,* 381 Mass. 65, 76 (1980). While the judge's ultimate findings of fact and rulings of law, as they bear on issues of constitutional dimension, are open for reexamination by this court, such ultimate findings are "entitled to substantial deference by this court." *Commonwealth* v. *Bookman,* 386 Mass. 657, 661 n.6 (1982). "Questions of credibility are, of course, for the . . . judge to resolve. *Commonwealth* v. *Meehan,* 377 Mass. 552, 557 (1979)." *Commonwealth* v. *Bottari,* 395 Mass. 777, 780 (1985). We now summarize the judge's findings of fact.

On September 14, 1983, at 1:30 A.M., Trooper Richard Whitehead was on routine patrol and driving south in a marked cruiser on Route 95 in North Attleborough. He turned off the highway at an exit and then drove onto the ramp leading to Route 95 north. At that point, he observed a late model Oldsmobile travelling north on Route 95 within the speed limit. He noticed that the automobile had its high beam headlights on. Another automobile was following it. Trooper Whitehead paced his cruiser so that both automobiles passed him before he entered the highway from the ramp.

The trooper observed that after the second automobile passed the Oldsmobile, the driver of the latter automobile did not lower the high beams. Thereupon, he closed the distance between his cruiser and the Oldsmobile to within two car lengths. From that distance, he observed that the validation sticker affixed to the license plate had expired at the end of August of 1983. At that point, he put on the dome lights and high beams of his cruiser and signaled the Oldsmobile to stop. He did not inform his headquarters that he had stopped a vehicle.

Trooper Whitehead got out of the cruiser and walked toward the Oldsmobile. He noticed that there were two males in the automobile. The driver of the Oldsmobile, subsequently identified as Jorge Mayans, stepped out of the automobile. He put his hands in the air, head high, palms forward, in a position commonly thought of as one of surrender. He started to walk toward Trooper Whitehead. This unusual behavior aroused the trooper's concern. He ordered Mayans to get back in his automobile three times, but Mayans failed to do so. Mayans then stated that he did not have a license and that he was driving because the passenger was ill.

The trooper then escorted Mayans to the passenger door of the automobile. As he did so, he saw the passenger, who was still in the automobile, and was later identified as Reynaldo Alcedo Jiminez, reach down very quickly toward the bottom of the passenger seat. Trooper Whitehead ordered Jiminez out of the automobile and asked him for some identification. Jiminez gave him a Florida license in the name of Alcedo. The license appeared to be in order. The trooper asked Jiminez

about the ownership of the automobile. He replied that it was a rental automobile and showed the rental agreement to Whitehead. The trooper noted that the agreement was in the name of one Castillo, not Alcedo. He asked Jiminez for some explanation and was informed that Castillo was a member of the family.

At this point, the trooper asked Jiminez why he had ducked down quickly while sitting in the passenger seat. Up to the time the trooper asked that question, Jiminez had been very courteous and polite. However, upon hearing this question, his expression changed and he appeared shaken, grim, and anxious. He looked at Mayans and did not answer the question. Officer Whitehead then became concerned about his own safety. He ordered the two men to walk forward to the front of their automobile, where he had them stand in front of the headlights. The trooper then positioned himself behind the passenger door. He swept his hand under the front passenger seat, where he discovered a loaded nine millimeter Mac 10 semi-automatic weapon. Trooper Whitehead asked the men if either had a license for the gun. Jiminez responded, saying that he had a Florida license but not with him. The trooper then told the men that they were under arrest. He ordered the two men to lie on the ground, which they did after the order was repeated several times.

Trooper Whitehead went back to his cruiser and radioed for assistance. Two police officers from North Attleborough arrived and, shortly thereafter, a State police cruiser. After the two defendants were placed in the cruiser, Trooper Whitehead continued the search of the defendants' automobile. Over the visor on the passenger side, he found a foil packet with a white powdery substance inside, which was later determined to be cocaine. Trooper Whitehead then removed the keys from the ignition and opened the trunk. He found a loaded sawed-off shotgun. Next to the shotgun was a brown paper bag with two parcels inside. Both parcels, it was later determined, contained cocaine.

a. *The "pursuit" of the defendants' automobile by the police.* The defendants claim that Trooper Whitehead "pursued" their automobile without legal justification before he observed that

the validation sticker on the license plate had expired and, therefore, they contend that their rights under the Fourth Amendment to the United States Constitution were violated.

Prior to the time that he signaled the driver of the defendants' automobile to stop, Trooper Whitehead's actions could not be characterized as a "pursuit." After he first saw the automobile, the trooper simply positioned his cruiser a short distance behind the defendants' automobile in order to observe its operation. At that point he did not attempt to stop it, nor was he pursuing it "to effect a stop." *Commonwealth* v. *Thibeau,* 384 Mass. 762, 764 (1981). The following of an automobile by the police did not "clash[ ] with individual rights [of the defendants]." *Commonwealth* v. *Wooden,* 13 Mass. App. Ct. 417, 419 (1982). In addition, we note that Trooper Whitehead and the defendants were travelling on a public highway at the time the cruiser was following the defendants' automobile. Surveillance of an automobile by a police officer does not encroach upon the privacy interests of the occupants where, as here, the officer makes his observations from a place where he is legally entitled to be. See *Commonwealth* v. *Oreto,* 20 Mass. App. Ct. 581, 584-586 (1985).

b. *Search of the automobile trunk.* Neither defendant challenges the judge's decision upholding the warrantless search of the passenger compartment. Mayans argues, however, that the extension of that search into the trunk was illegal because it was not justified by probable cause or exigent circumstances.

Over sixty years ago the Supreme Court established an automobile exception to the warrant requirement when it held that a warrantless search of an automobile by a police officer who has "reasonable or probable cause for believing that the automobile which he stops . . . has contraband . . . therein" does not violate the Fourth Amendment. *Carroll* v. *United States,* 267 U.S. 132, 156 (1925). More recently, the Court upheld the warrantless search of an automobile trunk. *United States* v. *Ross,* 456 U.S. 798 (1982). In *Ross* the Court held that "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search *of every part of the vehicle* and its contents that may conceal the object of the

search" (emphasis supplied). *United States* v. *Ross, supra* at 825. See *Commonwealth* v. *King,* 389 Mass. 233, 247 (1983). Here, Mayans concedes that the police had probable cause to search the automobile for weapons. Once a firearm and contraband had been found in the passenger compartment the police were justified in searching the trunk, "the trunk clearly being a 'part of the vehicle' capable of concealing 'the object of the search,' [i.e. drugs or weapons]." [2] *United States* v. *Rickus,* 737 F.2d 360, 367 (3d Cir. 1984), quoting from *Ross* at 825. [3]

2. *The questioning of Commonwealth witnesses by the judge.* As part of its case against the defendants, the Commonwealth introduced firearm certificates (G. L. c. 140, § 121A) and drug analysis certificates (G. L. c. 147, § 4D). To lay the foundation for introduction of these certificates the Commonwealth called two police officers as witnesses. During the course of their respective examinations the judge asked several questions of each officer. The defendants contend that in questioning these witnesses, the judge abdicated his role as an impartial arbiter and assumed the mantle of the prosecutor, thereby depriving them of a fair trial. We rule, however, that there was no error.

The first police officer, in answer to the prosecutor's questions, testified that he delivered the firearms found in the defendants' automobile to the ballistics laboratory in Boston. When the Commonwealth moved for admission in evidence of

---

[2] Mayans relies on *Commonwealth* v. *Ford,* 394 Mass. 421 (1985), for his argument that the search of the trunk was unreasonable. In *Ford,* a police officer opened the trunk of an impounded automobile for the purpose of securing certain personal property. He saw a rifle in the trunk and seized it. The court held that the warrantless search was unreasonable because the storage search was not conducted pursuant to standard police procedures. In addition, the court noted that "there was neither probable cause to search nor any special circumstances, such as an emergency, to justify a warrantless search without probable cause." *Commonwealth* v. *Ford,* 394 Mass. 421, 427 n.4 (1985). In the instant case, there was probable cause to search the automobile.

[3] *United States* v. *Rickus, supra,* also illustrates the wide variety of materials that some defendants have been found to have carried in the trunks of their automobiles. In that case the police found a .22 caliber semi-automatic pistol and a mask of Leonid Brezhnev.

the related firearm certificates, however, the judge refused to admit them, ruling that the Commonwealth was also required to establish when the witness retrieved the weapons from the laboratory in Boston.[4] The judge then proceeded to ask the witness a half dozen questions regarding the date when the witness retrieved the weapons from the laboratory. The answers were apparently satisfactory, because the firearm certificates were subsequently allowed in evidence.

The second police officer who was the subject of judicial questioning testified, in response to questions from the prosecutor, that he had taken three packages containing a white powdery substance to the laboratory in Boston for analysis. When the Commonwealth moved to admit in evidence the three corresponding certificates of analysis, the judge sustained the defendants' objections to their admission on the ground that the certificates had not been linked to the packages submitted for analysis. The prosecution then asked the witness for the laboratory number assigned to the three packages. At that point, the judge took over the questioning of the witness. He asked the witness several questions about the laboratory number and eventually admitted the drug analysis certificates.[5]

A trial judge is the " 'guiding spirit and the controlling mind at a trial.' " *Commonwealth* v. *Dias,* 373 Mass. 412, 416 (1977). As such, he "may properly question a witness, even where to do so may strengthen the Commonwealth's case, so long as the examination is not partisan in nature, biased, or a display of belief in the defendant's guilt." *Ibid.* Furthermore,

---

[4] The correctness of that ruling is not before us.

[5] It was not until well after the judge questioned the second witness that the defendants objected to the judicial questioning and requested a mistrial. The objection and the request were not timely. "While we understand the natural reluctance of trial counsel to object to questions . . . coming from a judge, sometimes trial counsel's duty to protect his client's rights requires him to object, preferably at the bench out of the jury's hearing." *Commonwealth* v. *Fitzgerald,* 380 Mass. 840, 846 (1980). An examination of this record does not show that counsel for either defendant was reluctant to object to any action by the judge. Therefore, as there was no justification for the defendants' failures to make timely objection, we examine their contentions under the "substantial likelihood of a miscarriage of justice" standard. *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967).

he may "ask questions to clarify a point, to prevent perjury, or to develop trustworthy testimony." *Commonwealth* v. *Fitzgerald,* 380 Mass. 840, 847 (1980). A trial judge, of course, should use his "power to ask questions with restraint". *Ibid.*

The questioning of the witnesses in this case was not partisan, nor did it convey to the jury the impression that the judge believed the defendants were guilty. Neither police officer questioned by the judge was a witness to the crime, and their testimony was technical in nature. The judge's questioning was obviously intended to clarify certain points relative to the introduction of the certificates in evidence. Moreover, the judge told the jury not to attach any significance to the fact that he asked the questions.[6] "We are not unmindful of the observation of Francis Bacon on the 'overspeaking judge' and we have not favored except in extenuating circumstances the takeover of questioning by a judge during the course of trial." *Commonwealth* v. *Campbell,* 371 Mass. 40, 45 (1976). However, in the circumstances presented here, there was no error.

3. *Discharge of empanelled juror.* After the close of the evidence and prior to the commencement of deliberations, one of the empanelled jurors requested to be excused from further service. The judge held a hearing in open court, outside the presence of the jury panel. The juror stated that she was presently employed but had just learned of a job opportunity at another company. She called that company for a job interview but was forced to accept an appointment which conflicted with the next scheduled court day. In response to a question from the judge, she stated that she could call the company and attempt

---

[6] During the course of his remarks to the jury the judge told them not to "draw any inferences from anything that I may ask in the questioning. I'm known as a judicial interferer, the lawyers don't like it sometimes, but I stick my nose in and ask questions and they may not like my asking questions." Counsel for the defendants have seized on the phrase "judicial interferer" and argue that it supports their argument that the judge improperly interfered with the trial.

As we have noted in the body of the opinion, the judge's intervention in the case by asking questions was not error. The fact that the judge stated to the jury that he is known, apparently by some lawyers, as a "judicial interferer" did not turn his intervention into an example of judicial interference.

to postpone the interview but was unsure whether the job would be left open for her. She also stated that the job interview was important to her. At the conclusion of the hearing, the judge discharged the juror, over the objections of defense counsel.[7] They claim that the judge abused his discretion in dismissing the juror.

There do not appear to be any cases that deal with the procedure involving the discharge of an empanelled juror *prior* to the commencement of deliberations.[8] However, cases that are concerned with the interpretation of a statute that permits a discharge of a deliberating juror form a useful background for our analysis. *Commonwealth* v. *Haywood,* 377 Mass. 755, 765-770 (1979). *Commonwealth* v. *Webster,* 391 Mass. 271, 275-276 (1984). *Commonwealth* v. *Connor,* 392 Mass. 838, 842-847 (1984).

General Laws c. 234, § 26B, as amended through St. 1979, c. 344, § 9A, provides for substitution of an alternate juror if a deliberating juror "dies, or becomes ill, or is unable to perform his duty for any other good cause shown to the court." Those occasions mentioned in the statute are precisely the same circumstances that would permit the discharge of an empanelled juror *prior* to the commencement of deliberations. *State* v. *Trent,* 157 N.J. Super. 231, 239 (1978), rev'd on other grounds, 79 N.J. 251 (1979), cited in *Commonwealth* v. *Connor,* 392 Mass. 838, 845 n.4 (1984). The Commonwealth contends that the juror was discharged for "good cause". It has been held that "good cause," as it appears in § 26B, "includes only reasons personal to a juror, having nothing whatsoever to do with the issues of the case or with the juror's relationship with his fellow jurors." *Commonwealth* v. *Connor, supra* at 844-845. Here, that standard was met, as the juror was

---

[7] Because alternate jurors had been empanelled, the verdicts against the defendants were returned by a twelve person jury.

[8] The matter is now covered in G. L. c. 234A, § 39, as amended by St. 1984, c. 189, § 158, which provides in part: "The court shall have authority to excuse and discharge an impanelled juror prior to jury deliberations after a hearing upon a finding of extreme hardship." That statute did not apply to jury trials in Bristol County at the time of the judge's action.

discharged because of a personal situation, not connected to her relationship with her fellow jurors or her views on the case. We recognize that not every personal situation will justify the dismissal of an empanelled juror prior to deliberations (see note 8, *supra*). However, in this case the job interview was important to the juror. A continuation of her jury service might well have resulted in a hardship in light of a possible loss of a job opportunity. In the circumstances, the judge did not abuse his discretion in discharging the juror prior to deliberations.

4. *Other issues.* The other issues raised by the defendants are without merit and do not warrant extended discussion.

a. The judge's decision to admit in evidence the firearm discovered underneath the passenger seat was not error. It was authenticated by Trooper Whitehead, and there was adequate evidence of the chain of custody. Any weaknesses in the chain affected the weight rather than the admissibility of that evidence. *Commonwealth* v. *Berth,* 385 Mass. 784, 791 (1982).

b. Jiminez's motion for a required finding of not guilty on the charge of unlawful possession of a sawed-off shotgun on the ground that no evidence was introduced as to the length of the barrel was properly denied. There was ample evidence in regard to the barrel. The firearm itself was placed in evidence. The jury could readily observe that its barrel was several inches less than eighteen inches. Two police officers described the firearm as a "sawed-off shotgun." See *Commonwealth* v. *Sperrazza,* 372 Mass. 667, 670 (1977) (testimony that weapon in question was a "revolver" or a "handgun" held sufficient to support the conclusion that the barrel was less than sixteen inches, as revolvers or handguns are ordinarily short firearms). In sum, the evidence was sufficient to establish beyond a reasonable doubt that the length of the barrel was less than eighteen inches.

c. The citation to the statute under which Mayans was charged with unlawful possession of a sawed-off shotgun was typed incorrectly.[9] Mayans filed a motion for a required finding of

---

[9] The indictment refers to G. L. c. 269, § 10C, rather than G. L. c. 269, § 10(c). The miscitation is repeated on the front of the indictment.

not guilty based on the defect. His motion was denied by the judge.

The body of the indictment listed the date and location of the alleged crime. It correctly stated the nature of the crime with which the defendant was charged. The description satisfied art. 12 of the Declaration of Rights of the Massachusetts Constitution and Mass.R.Crim.P. 4(a), 378 Mass. 849 (1979). Moreover, Mayans does not even claim that he was prejudiced by the defect. His contention that the judge erred borders on the frivolous.

d. Mayans' contention that G. L. c. 94C, § 32E(*b*)(3), as appearing in St. 1982, c. 650, § 11, is unconstitutionally vague was rejected in *Commonwealth* v. *Maracic,* 18 Mass. App. Ct. 722 (1984).

*Judgments affirmed.*