COMMONWEALTH vs. STEPHEN J. CARNEY
(and three companion cases).[1]

No. 90-P-1129.

Plymouth. April 5, 1991. - August 15, 1991.

Present: WARNER, C.J., BROWN, & GREENBERG, JJ.

*Burning of Property. Practice, Criminal,* Fair trial, Comment by judge,
    Sentence, Opening statement, Deliberation of jury, Instructions to jury.
    *Constitutional Law,* Assistance of counsel. *Evidence,* Motive, Con-
    sciousness of guilt.

At a criminal trial, certain comments of the judge in the presence of the
    jury, which the defendants claimed demonstrated the judge's alleged
    bias, did not deprive the defendant of a fair trial. [252-255]
Nothing in the record of a criminal proceeding demonstrated that the
    judge penalized the defendants for exercising their right to a jury trial.
    [255-256]
In an appeal of a criminal case, the record was not adequate to present the
    claim of one defendant that his trial counsel was ineffective. [256-259]
In a criminal case, no error appeared in the judge's handling of a commu-
    nication from the jury during deliberations [259], or in his instructions
    with respect to the presumption of innocence [259], or in the admission
    in evidence of certain statements of one of the defendants [259-260].

INDICTMENTS found and returned in the Superior Court
Department on August 23, 1988.

The cases were tried before *John D. Sheehan,* J.

*Wendy Sibbison* for Stephen J. Carney.

*Stephen Hrones* (*Murray Kohn* with him) for Christopher
S. Carney.

---

[1]One against Stephen J. Carney and two against Christopher S. Carney.
The codefendants were each originally charged on companion indictments
of arson, G. L. c. 266, § 1, and breaking and entering in the nighttime,
G. L. c. 266, § 15. At the conclusion of the Commonwealth's case, the
judge directed verdicts on the arson indictments but allowed the jury to
consider the evidence on the lesser included offense of burning a building.
G. L. c. 266, § 2.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

GREENBERG, J. Flames burst from the Bell family barn in Duxbury on the evening of April 28, 1988. The barn was behind Bruce and Daphne Bell's residence where they lived with their daughter, Andrea, and other family members. Daphne Bell, first to notice an orange-yellow light emanating from a window, ran into the barn where she observed two men pouring liquid onto bales of hay. She shouted, prompting both to flee. After returning to her house to sound a telephone alarm and alert her husband and daughter, she returned to the conflagration to save the animals trapped inside (a donkey and fourteen greyhounds and whippets). Her initial efforts were unsuccessful, but, on her second rescue attempt, she managed to free all but the donkey and two of the dogs. Her second foray into the barn proved costly. Overcome by the smoke, she lost consciousness and suffered serious burns. She was taken from the scene by ambulance to a local hospital, then transferred to Massachusetts General Hospital, where she remained for nearly three months.

As part of their investigation, police spoke with the Bell's daughter, Andrea, and learned that three years earlier the defendant Stephen Carney had fathered her child, who is in her custody. It appeared that, since the child's birth, Andrea's and Stephen's relationship had ended — in no uncertain terms. Conflicts over visitation resulted in the Bells' banishment of Stephen from their residence. There was evidence that, four weeks prior to the fire, an argument had erupted after an unannounced appearance by Stephen at the Bell residence. Andrea ultimately interceded in a confrontation between Stephen and her father. Theorizing that such animus might have motivated Stephen and his brother, the codefendant, Christopher Carney, to act in reprisal, police investigators focused on the brothers' activities on the night of the fire.

For her part, Daphne Bell was first questioned in the hospital on July 11, 1988, where she told a Duxbury police officer that she had seen two men in the barn pouring gas on

the flames. She added that one of the men "looked like Stephen Carney" and the other was a "marine type" with a crewcut, wearing "flashy clothes." On the following day, she identified both defendants from a photographic array arranged by a State police arson investigator. They were arrested immediately thereafter.

The principal theory of the defense, developed through cross-examination of the Commonwealth's witnesses, was that Daphne Bell started the fire — presumably in concert with her husband — in order to collect on an insurance policy. The defendants introduced evidence that the Bells had filed for debtor protection under 11 U.S.C. §§ 1321 et seq. (1988) two years prior to the events in question. After an emotionally charged week-long trial, the defendants were convicted on both charges on May 26, 1989.

1. *The unfair trial claim.* The defendants assign as errors various comments the judge made in the presence of the jury, the cumulative effect of which they now claim deprived them of a fair trial. *Commonwealth* v. *Sneed*, 376 Mass. 867 (1978). Cutting and pasting portions of the record to suit their argument, the defendants attempt to cloak the judge in a partisan mantle. Viewing the entire trial in context, as we must, we conclude that the judge's remarks did not deprive the defendants of a fair trial.

a. *The judge's partiality to Daphne Bell.* The defendants' judicial bias claim centers on the judge's alleged regard for and treatment of the prosecution's main witness, Daphne Bell. Beginning with voir dire[2] and progressing through the trial, the defendants argue, the trial judge championed the witness and protected her during cross-examination.

For example, on cross-examination, Daphne Bell became confused as to whether defense counsel was asking her to describe the persons she saw in the barn from her present memory or to confirm her prior statements to the police. The judge, as an aside, stated, "Before this woman — she has been a good witness, but [she] is not a professional witness

---

[2]We treat remarks made by the judge after voir dire in our discussion on sentencing in section 1(b) below.

. . . ." The defendants' contention that, through this comment, the judge "vouched" for the credibility of the witness and thereby caused the jury to accept her version of events, see *Commonwealth* v. *Green*, 25 Mass. App. Ct. 751, 752-753 (1988), is without merit. The judge, sensitive to a lay witness's misunderstanding of an impeachment question, reacted to her confusion with a supportive comment which was harmless in the context of her testimony. See *Commonwealth* v. *Marangiello*, 410 Mass. 452, 461 (1991); *Commonwealth* v. *Berger*, 9 Mass. App. Ct. 814, 814-815 (1980). Furthermore, a short colloquy between judge and witness followed which made clear that the judge's purpose was to focus her testimony on what she related to the police investigators, leaving her credibility for the jury.

Next, the defendants complain that the judge, in attempting to squelch an appeal by the prosecutor to the jurors' sympathy for Daphne Bell's fire-related injuries, managed to achieve the reverse. During the course of the trial, it was obvious to the jury that Daphne still suffered from some visible effects of the injuries. In this connection, we must examine the judge's remark to the prosecutor: "We all felt sorry for her. What more do you want?" Defense counsel recorded no objection, although they later challenged the remark in a motion for mistrial on the fourth day of trial.[3] While the comment may, in hindsight, better have been left unspoken, we cannot say that it likely moved the jurors' sympathies towards the complaining witness. See *Commonwealth* v̇. *Fitzgerald*, 376 Mass. 402, 424-425 (1978), where similar references to the accusing witness in the jury instructions were

---

[3]In their joint motion for mistrial, counsel objected to (1) a question the judge put to Daphne which prompted a response that the donkey had burned to death; (2) the judge's comment that "[they] all [felt] bad for Mrs. Bell"; and (3) a remark by the judge, relative to a defense objection, that he didn't "know of any case that [had] been overturned based on a ruling on an evidentiary point." As to this final allegation, we find it "highly unlikely . . . that the jurors would be aware that most criminal appeals are taken by the defense or that they would deduce, from that fact, that the trial court's reference to an appeal was somehow a comment upon [their] guilt." *United States* v. *Hood*, 593 F.2d 293, 298 (8th Cir. 1979).

not so prejudicial as to constitute a risk of a miscarriage of justice.

The primary theory of defense, as will be recalled, was that the Bells set fire to their own barn. The issues were contested by experienced and zealous advocates. At one point during cross-examination of Daphne Bell, the judge felt it necessary to caution Christopher's counsel against combatively approaching the witness — "jumping at her." We find that similar comments by the judge, too numerous to detail, were constructive, and not, as argued by the defense, derisively prejudicial. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 118-119 (1980) (the judge must be the trial's "directing and controlling mind"). Our examination of the entire record reveals that the judge, at times beleaguered by contentious and prolonged examinations of witnesses, was even-handed and fair in his evidentiary rulings. *Commonwealth* v. *Perez*, 390 Mass. 308, 316 (1983). *Commonwealth* v. *Mazzola*, 22 Mass. App. Ct. 683, 687 (1986). The judge did not cross the line separating judicial guidance from judicial bias. Contrast *Commonwealth* v. *Sneed*, 376 Mass. at 869-870; *Commonwealth* v. *Sylvester*, 388 Mass. 749, 750-752 (1983).

Finally, if any harm resulted, the judge's instructions were sufficient to vitiate the prejudice. *Commonwealth* v. *Cohen*, 27 Mass. App. Ct. 1210, 1211 (1989). He stated as follows: "Now my job is to conduct a fair trial, to make rulings on law, to rule on objections and to conduct the atmosphere of the courtroom in as fair and orderly a manner as I can. However, I don't want any one of you to look to me to see if you can determine how I feel about this case . . . . I have made some remarks during the course of the trial which unfortunately may be my way of doing things. What I say, what questions I ask, what statements I may make here, are not to be used by you in any way in figuring or determining how I feel this case should be decided. I have no right to interfere with your duties which is to find the facts and determine where the truth lies. That's your duty." In addition, the jurors were instructed that they were the sole judges of credibility. Compare *Commonwealth* v. *Haley*, 363 Mass. 513,

522 (1973); *Commonwealth* v. *Paradise*, 405 Mass. 141, 157 (1989); *Commonwealth* v. *Jiminez*, 22 Mass. App. Ct. 286, 293 (1986).

b. *The excessive sentencing claim*. The final matter relating to the defendants' claim of judicial bias arose immediately after Daphne Bell's testimony at the voir dire hearing on the defendants' joint motion to suppress her identification. After denying the motion, and before starting the jury trial, the judge spoke with the attorneys and suggested the following: "Gentlemen, I want to tell you my position for what it's worth. Have you people ever thought of any way of disposing of this case without a trial? I think that [Daphne Bell] is a devastating witness. I think you should consider if you haven't if there is any way. If there isn't, it's all right, but I just want to point out clearly to you that I was most impressed with that witness, and I believe the jury will be, too. . . . [L]et me say that before this picture becomes a thorn in my side you might do a lot better with me before the trial than after. I want to point out to you . . . in view of what little I know about this case, that, should there be a conviction here, there would be serious consequences following."

Trial counsel did not register any objection to the judge's ruminations or to the sentence. See *Commonwealth* v. *Morse*, 402 Mass. 735, 739 (1988). We do not know from the transcript whether counsel discussed the judge's remarks with the defendants. On appeal, however, the defendants characterize the judge's suggestion as creating an impermissible "plea or else" ultimatum and evincing a plain intent to punish the defendants for exercising their right to trial. See *United States* v. *Goodwin*, 457·U.S. 368, 373 (1982); *Letters* v. *Commonwealth*, 346 Mass. 403, 405-406 (1963); *Commonwealth* v. *Johnson*, 27 Mass. App. Ct. 746, 750 (1989). To the extent that any such threat may be read into the judge's remarks, the record is devoid of any subsequent actions indicating that the judge punished the defendants for going to trial. As discussed *supra*, a comprehensive examination of the trial transcript reveals no substantiation for the defendants' claim that their right to a fair trial was abridged.

Contrast *Commonwealth* v. *Sylvester*, 388 Mass. at 752 (judge's unduly harsh and repetitive criticisms of counsel permeated the trial to such an extent that the defendant was deprived of a fair trial); *Commonwealth* v. *Coleman*, 390 Mass. 797, 810 (1984) (judge commented on the defendant's perjury during sentencing); *Commonwealth* v. *Souza*, 390 Mass. 813, 817 (1984) (judge presumed the defendant's guilt and imposed a penalty for an untried criminal offense); *Commonwealth* v. *Gresek*, 390 Mass. 823, 829-832 (1984) (indication that sentencing was influenced by defendant's perjury).

Prior to sentencing the defendants, the judge requested and received a presentence report in accordance with Mass.R.Crim.P. 28(d)(2), 378 Mass. 899 (1979). He postponed sentencing the defendants both to effect full and fair arguments thereon and to allow the tensions of the trial to abate. Finally, the judge rejected the Commonwealth's recommendations at the sentencing hearing and imposed substantially more lenient sentences.[4] We may not speculate on the thought processes of a trial judge which are not apparent on the record. *Glenn* v. *Aiken*, 409 Mass. 699, 703-704 (1991). Nothing before us indicates that the judge penalized the defendants for pursuing their right to trial.

2. *Ineffective assistance of counsel claim.* At the end of his opening statement, Christopher's attorney promised the jury that he would produce alibi evidence: "You'll hear evidence as to where my client was at the time of this incident, as best as he can reconstruct his day. You [will] have some documentary evidence as to where he was approximately on the date and who contacted him, and approximately the time of

---

[4]The Commonwealth's sentencing recommendation for Christopher was nine to ten years in State prison on the burning of a building conviction with a consecutive sentence of three to five years on the conviction of breaking and entering in the nighttime with intent to commit a felony. For Stephen, the recommendation was nine to ten years in State prison on the arson conviction and a consecutive twelve to twenty years in State prison on the conviction of breaking and entering with intent to commit a felony. The judge imposed concurrent terms of three to five years in State prison on the convictions of Christopher and concurrent terms of nine to ten years on the convictions of Stephen.

this fire, which is after 11 and before 11:28." As it happened, Christopher's attorney presented no alibi evidence whatsoever. The jury never learned from Christopher or from any other witness where he was the evening of the fire; nor did defense counsel deliver the documentary alibi evidence promised. Counsel did not offer in his closing argument to the jury any plausible explanation for his unkept pledge. Although Daphne Bell positively identified Christopher as one of the men she observed pouring gasoline in the barn that evening, the strength of her identification was diluted by the traumatic nature of her experience and the time which elapsed between the crime and her photographic identification in the hospital. She testified that she had seen Christopher only fleetingly four or five times before the fire. Apart from sibling loyalty, the Commonwealth's evidence in no manner tended to prove the existence of a disposition or motive material to his participation. Contrast *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695-696 (1979). We agree with Christopher that his trial counsel, in failing to fulfil his promise of alibi evidence, may have deflected the jury's attention from consideration of the unreliability of Daphne Bell's crucial identification testimony — the only evidence linking Christopher to the fire.

On a claim of ineffective assistance of counsel, the defendant shoulders the burden of showing that his counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," and that counsel's deficiency "likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). *Commonwealth* v. *White*, 409 Mass. 266, 272-276 (1991).

Here, the failure of Christopher's counsel either to produce the promised alibi evidence or to explain its absence presents a serious question as to his effectiveness. One court has said that "little is more damaging than to fail to produce important evidence that had been promised in an opening." *Anderson* v. *Butler*, 858 F.2d 16, 17 (1st Cir. 1988). In *Harris* v. *Reed*, 894 F.2d 871 (7th Cir. 1990), defense counsel, in his

opening, told the jury that the defendant would provide eye-witness testimony contradicting the prosecution's principal witness. As in the present case, counsel neither delivered the witness nor accounted for his absence. Compare *Commonwealth* v. *Aviles, ante* 244 (1991) (counsel presented some evidence of alibi as promised in opening but failed to produce other alibi evidence and made no mention of alibi in closing argument). Contrast *Anderson* v. *Butler, supra* at 17 n.1 (counsel told jury in his closing why he had decided not to present medical experts); *Commonwealth* v. *Nardone*, 406 Mass. 123, 127 (1989) (counsel's failure to call a witness, as promised, was "decision forced upon him by events over which he had no control"). Applying the standard enunciated in *Strickland* v. *Washington*, 466 U.S. 668 (1984),[5] the court in *Harris* reversed the defendant's conviction, reasoning that, after preparing the jury for the evidence in his opening, defense counsel, by not producing the witness, displayed "unreasonable professional conduct." 894 F.2d at 879.

Although we believe the first prong of the *Saferian* test might be met, we cannot conclude that Christopher is entitled to a new trial. On the record before us, we have no way of reckoning whether the alibi evidence had become unavailable or whether counsel's ultimate decision not to put on an alibi defense was "manifestly unreasonable." See *Commonwealth* v. *White*, 409 Mass. at 273. We do not have the benefit of a memorandum from the trial judge on the nature of the defendant's alibi, *ibid.*, or an in camera accounting from Christopher's counsel as to why it was omitted. Without this information, we cannot say, first, whether counsel's perform-

---

[5]The *Strickland* case set forth this test for ineffectiveness: first, whether counsel's representation "fell below an objective standard of reasonableness . . . under prevailing professional norms," *id.* at 687-688, and then, whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 695. While the Supreme Judicial Court has yet to harmonize completely the State and Federal standards for ineffectiveness of counsel, see *Commonwealth* v. *Haggerty*, 400 Mass. 437, 438 n.2 (1987), they have said that the *Saferian* test is at least as strict as the Federal test. *Ibid.*

ance was constitutionally deficient and, second, whether any deficiency revealed prejudiced the outcome of the trial. We conclude that exploration of these issues is better left for the trial judge in a motion for new trial. Mass.R.Crim.P. 30, 378 Mass. 900 (1979). See *Commonwealth v. Shaheen*, 15 Mass. App. Ct. 302, 309-310 (1983).

3. *Remaining claims.* We consider the defendants' other contentions in summary fashion.

a. Two hours into their deliberations, the jury delivered the judge a note informing him that they were divided — six jurors favored a guilty verdict, two not guilty, and four were undecided, as to both defendants. They asked that they be permitted to leave for the evening and return the next morning. The judge granted their request and sealed the note, properly reporting to counsel only that he had received a note from the jury and that he had released them for the night. See *United States* v. *Rengifo*, 789 F.2d 975, 985 (1st Cir. 1986). The defendants now claim prejudice as a result of the judge's failure to divulge the split in the jury's deliberations. We agree with the Commonwealth that, because the note gives no indication that the jurors were intractably deadlocked, there was absolutely no reason for the judge to require them to make a decision or to instruct them further. Cf. *Commonwealth* v. *Harvey*, 397 Mass. 351, 360 (1986).

b. The judge's charge on presumption of innocence in no way suggested to the jury that they could have decided the case "in the middle of trial" as the defendants argue. The judge's instructions, considered in their entirety, made clear that the indictments did not imply guilt and that the Commonwealth bore the burden of proving all the essential elements beyond a reasonable doubt. The burden of proof, he charged, "rests squarely only on the shoulders of the Commonwealth and never changes." There was no error. See *Commonwealth* v. *Boyd*, 367 Mass. 169, 188 (1975); *Commonwealth* v. *Wills*, 398 Mass. 768, 781 (1986).

c. The trial judge did not commit "palpable error," see *Commonwealth* v. *Booker*, 386 Mass. 466, 469-470 (1982), in allowing evidence of three statements by Stephen Carney

to Andrea Bell — two before the fire in which he told her that they would have to settle their visitation dispute in "other ways" and that she "would be hearing from him within two weeks," and one after the fire in which he asked her rather specific questions concerning the progress and particulars of the ongoing arson investigation. The pre-incident statements were admissible as they tended to show motive. *Commonwealth* v. *Mahoney*, 406 Mass. 843, 849 n.5 (1990). The post-incident questions were equally probative as those deemed admissible in *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 51-52 (1975). Whether the inferences put forward by the prosecution were warranted was appropriately left to the jury. *Commonwealth* v. *Booker*, *supra* at 470. *Commonwealth* v. *Kennedy*, 389 Mass. 308, 310 (1983).

*Judgments affirmed.*