COMMONWEALTH *vs.* JOHN A. KENISTON.

Suffolk. September 13, 1995. - July 26, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, & O'CONNOR, JJ.

*Homicide. Practice, Criminal,* Failure to object, Comment by judge, Conduct of prosecutor, Instructions to jury, Presumptions and burden of proof, Reasonable doubt, Capital case. *Evidence,* Cross-examination, Photograph, Videotape, Credibility of witness, Absence of witness.

Evidence at a first degree murder trial was sufficient to warrant the jury's determination that the defendant was guilty. [307-308]

There was no error in the admission of certain evidence at a murder trial and there was no substantial likelihood of a miscarriage of justice created thereby. [308-309]

At a murder trial, the judge acted properly within his discretion in limiting defense counsel's cross-examination of two prosecution witnesses. [309]

At a murder trial the judge did not err in permitting in evidence certain photographs and a videotape, where that evidence was relevant to the issue of extreme atrocity or cruelty. [309-310]

At the trial of a criminal case, the judge's admonition to defense counsel not to yell at the witnesses was not improper and did not prejudice the defendant. [310-311]

On appeal from a conviction of murder in the first degree there was no merit to the defendant's contention that he was entitled to a new trial for the prosecutor's alleged insinuation that defense counsel had taken the missing murder weapon. [311]

No substantial likelihood of a miscarriage of justice was created at a murder trial by certain remarks in the prosecutor's closing argument. [311-312]

At a murder trial, there was no error in the judge's instructions to the jury on witness credibility [312-313], on motive [313-314]; or in his refusal to give a requested missing witness instruction [314] or a manslaughter instruction [314-315] where those were not appropriate; and there was no substantial likelihood of a miscarriage of justice created by the judge's instructions on reasonable doubt, viewing the instructions as a whole [315-317].

INDICTMENT found and returned in the Superior Court Department on September 20, 1989.

The case was tried before *Robert Malcolm Graham,* J.

*William P. Homans, Jr. (Jonathan S. Sales* with him) for the defendant.

*Jane Woodbury,* Assistant District Attorney (*Mary Ames,* Assistant District Attorney, with her) for the Commonwealth.

O'CONNOR, J. A jury found the defendant guilty of murder in the first degree with deliberate premeditation and extreme atrocity or cruelty. On appeal, the defendant argues that evidence was erroneously admitted at trial, cross-examination was unfairly limited, the judge improperly and prejudicially admonished defense counsel in the presence of the jury, and harmful prosecutorial misconduct occurred. The defendant also challenges the judge's instructions to the jury. We affirm the conviction.

We set forth some of the pertinent trial evidence as follows. Kenneth Wythe and the defendant became acquainted in the early 1980's. Soon after they met, they entered into a sexual relationship, following which they did not see each other for several years until the late 1980's when their relationship was casual. On September 1, 1989, Wythe and the defendant met at a bar. The defendant spent that night with Wythe in Wythe's apartment. The apartment was in a house in the Dorchester section of Boston, owned by the victim in this case, Ernest R. Jordan. Jordan lived there with a group of homosexual males. For a period ending a month or month and one-half before September 1, 1989, Wythe was Jordan's lover. By September, Wythe's relationship with Jordan was more of "caregiver" than lover. Wythe testified that, at that time, he "was more involved in trying to help Ernie work out his problems with drinking."

On the morning of September 2, following the night that the defendant spent with Wythe, Jordan, the victim, went to Wythe's third-floor bedroom, where he found Wythe and the defendant. Wythe assisted Jordan, whom he perceived to be inebriated, back to Jordan's bedroom. Thereafter, the defendant stayed at Jordan's house as a paying tenant. He stayed with Wythe in Wythe's apartment.

Several days before Jordan was killed, Wythe heard the defendant and Jordan arguing. The defendant called Jordan an "asshole" and said he would "take care of him."

The defendant talked openly about his relationship with Wythe in front of Jordan and two other tenants, Michael Siler and Ronald Riley. The defendant forcefully said that Wythe belonged to him and that nobody would take Wythe from him. In the week before Jordan was killed, the defendant made such statements in Jordan's presence repeatedly.

On September 2, 1989, William Scott, a friend of Siler, observed a large knife with a long silver handle "stuffed in the back of" the defendant's pants. After taking the knife away from the defendant, Scott asked the defendant what he was going to do with the knife, at which point the defendant grinned at Scott and continued down the stairs. Scott brought the knife to Siler's room and put it under the mattress, and Siler subsequently put the knife on top of his bureau.

Michael Carter testified that sometime around 6 or 7 P.M. on the evening of September 8, the defendant and Siler were upset because some food had disappeared from the house. The defendant stated to Siler, "I'll cut your throat right now."

Jordan was killed on September 8. On that day, between 5 and 6 P.M., Wythe went downstairs to the kitchen where he found Jordan and the defendant. Carter, Siler, and Riley came into the kitchen. Wythe had made plans to visit his friend of many years' duration, Dennis Holland, at Holland's house in Cambridge. He left Jordan's house between 7:30 and 8 P.M. for that purpose. Carter and Siler left at the same time. At 8 P.M., Riley retired to his basement apartment. The defendant and the victim remained in the house. At 9 P.M., Riley heard the defendant and Jordan arguing. Jordan stated, "I know what's going on around here. Don't tell me. I know." The defendant replied in a loud, heated voice, "You don't know shit. You don't know shit. Then tell me what's going on." Wythe returned to Jordan's house at about 9:30 that evening. The defendant told Wythe that Jordan was taking a nap. Carter and Siler returned to the house at 10 P.M. and remained in Siler's upstairs bedroom for three hours. Wythe made drinks for himself and the defendant and carried them to the den on the second floor, where the two watched a movie. Wythe spoke with the defendant while watching the movie and had a normal conversation with him.

At 11:30 P.M. Wythe dialed Holland's telephone number at the defendant's request, and the defendant told Holland that he "took care of the problem." Neither Wythe nor Holland knew the meaning of the defendant's statement. Deciding that he wanted to visit Holland at 1:30 A.M., Wythe knocked on Jordan's bedroom door to obtain some cologne. Receiving no response, Wythe walked into Jordan's room to discover Jordan in his bed, lying still, with his head "smashed open" and blood splattered on the bedroom wall.

Wythe telephoned the police from a public telephone booth because he feared for his safety. Police officers responded to Wythe's call and went to Jordan's house. A detective videotaped the scene in Jordan's bedroom. Blood, hair and skull fragments were on the corner of the nightstand within a foot of Jordan's head. An officer "lifted" five fingerprints from Jordan's bedroom, three of which were later identified by a latent fingerprint examiner as the defendant's. Detective Charles M. Horsley observed the defendant seated on the loveseat in the den with his head back and eyes closed. The defendant's white mesh shirt, shorts, legs and sneakers were splattered with blood containing the B antigen, which was consistent with the victim's type B blood. As a result of the medical examiner's determination that a cutting instrument caused some of Jordan's injuries, Horsley began to search the premises for a large-bladed knife. Officers ordered the defendant to stand up from the loveseat. Lifting the cushions on which the defendant had been seated, the officers discovered a knife with a stainless steel handle. The knife's long blade was stained with blood containing the B antigen. The medical examiner saw eleven stab wounds in Jordan's torso and three lacerations on the left side of Jordan's head. The cause of the victim's death was determined to be multiple traumatic injuries.

The defendant argues that the evidence did not warrant a finding that he, rather than Wythe, killed Jordan. Relying to a large degree on *Commonwealth* v. *Salemme*, 395 Mass. 594 (1985), and *Berry* v. *Commonwealth*, 393 Mass. 793 (1985), the defendant contends that the evidence showed that Wythe and he had equal opportunity and the same disposition toward Jordan, and that one or the other of them killed him, but it leaves the matter of who did it to conjecture. We disagree. Unlike the situation in *Berry* v. *Commonwealth, supra*, the evidence set forth above, if believed, not only demonstrated the defendant's sole opportunity to cause the death as it occurred, but also showed the defendant's intense hostility, not shared by Wythe, toward Jordan. That there also may have been contrary evidence is without significance in measuring the legal sufficiency of the evidence to warrant the jury's determination of guilt. In addition, here, unlike the cases on which the defendant relies, there was evidence that the defendant's clothing bore blood that was consistent with the

victim's blood type and police discovered the defendant seated on cushions concealing a blood-stained knife that the defendant had carried on his person shortly before the killing. Finally, the jury could have believed Wythe's testimony that he was "scared" and "confused" when he discovered Jordan's body surrounded by blood and left the house to call the police out of fear for his own safety. See *Commonwealth* v. *Avellar,* 416 Mass. 409, 415 (1993) (holding nothing further was needed to reach the threshold of sufficient evidence to support the defendant's conviction of first degree murder than physician's testimony that fatal injuries were inflicted on the infant victim during a twelve-hour period when only the defendant and three other persons had access to the victim, and the three other individuals' testimony that they did not "do anything" to the victim).

We turn briefly to the defendant's argument that his conviction should be reversed because the trial judge erred in admitting in evidence (1) Carter's testimony that he overheard the defendant threatening to cut Siler's throat; (2) Riley's testimony that he overheard the defendant threaten an unknown person; and (3) Riley's testimony that he overheard the defendant and Jordan arguing on the night of Jordan's murder. The defendant did not object at trial to the introduction of this evidence. His unsuccessful motion in limine, through which he attempted to exclude testimony about his threat to cut Siler's throat, is "insufficient to preserve appellate rights where . . . there was no objection at trial to the introduction of evidence." *Commonwealth* v. *Boyer,* 400 Mass. 52, 57 (1987). See *Sandler* v. *Commonwealth,* 419 Mass. 334, 338 n.3 (1995); *Adoption of Carla,* 416 Mass. 510, 515 (1993) (assertion of privilege in motion in limine insufficient to preserve appellate rights absent attempt to exercise privilege at trial); *Commonwealth* v. *Shea,* 401 Mass. 731, 740 (1988). "In considering issues argued on direct appeal as to which the defendant's appellate rights were not preserved by an objection or in some other manner, we must apply the standard of G. L. c. 278, § 33E (1990 ed.). We must decide whether there is a substantial likelihood that a miscarriage of justice has occurred. *Commonwealth* v. *Garcia,* 379 Mass. 422, 439 (1980)." *Commonwealth* v. *Wright,* 411 Mass. 678, 681 (1992). We are content that the admission of Carter's and Riley's testimony set forth above was not erroneous and, in

any event, did not result in a substantial likelihood of a miscarriage of justice.

The defendant's next contention relating to evidence is that he is entitled to a new trial because the judge improperly limited his counsel's cross-examination of Wythe and Holland. The defendant asserts that, in restricting his counsel's cross-examination of Holland regarding Wythe's lifestyle as a "partier," the judge wrongfully precluded defense counsel from showing the lack of credibility of Wythe's claim that he was trying to help Jordan to deal with his drinking problem. Also, the defendant contends that the judge erred in limiting defense counsel's cross-examination of Wythe, thereby excluding questions relevant to Wythe's credibility. We have carefully reviewed the transcript and we are satisfied that the judge acted well within his discretion in limiting defense counsel's cross-examination of Wythe and Holland.

The defendant also argues that the judge erred in permitting the Commonwealth to introduce in evidence allegedly cumulative and unnecessarily inflammatory photographs and a videotape showing the bloody crime scene and the victim's body. We have held in numerous murder cases that photographic evidence of the victim's body was relevant and admissible on the issue of extreme atrocity or cruelty. See, e.g., *Commonwealth* v. *Meinholz,* 420 Mass. 633, 635 (1995); *Commonwealth* v. *Simmons,* 419 Mass. 426, 431 (1995); *Commonwealth* v. *Phinney,* 416 Mass. 364, 375 (1993); *Commonwealth* v. *Blake,* 409 Mass. 146, 159-160 (1991); *Commonwealth* v. *Rosado,* 408 Mass. 561, 567-568 (1990); *Commonwealth* v. *Gallagher,* 408 Mass. 510, 519 (1990); *Commonwealth* v. *Ramos,* 406 Mass. 397, 406-407 (1990). "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome or may have an inflammatory effect on the jury.' " *Id.,* quoting *Commonwealth* v. *Bys,* 370 Mass. 350, 358 (1976). In this case, photographs showing the locations of the wounds inflicted on Jordan and the blood, hair, and skull fragments found in his bedroom substantiated the Commonwealth's extreme atrocity or cruelty theory of first degree murder. Additionally, the judge cautioned the jurors that the photographs were "not intended in any way to elicit sympathy for the decedent or prejudice this defendant in any way in his receiving a fair trial." See *Phinney, supra* (holding judge

furnished adequate instructions to the jury to guide their consideration of photographic evidence). We reject the defendant's contention that admission of the photographs and videotape deprived him of a fair trial.

The next defense contention we shall consider is that the defendant was unfairly prejudiced when, during defense counsel's cross-examination of William Scott, the judge addressed counsel within the jury's hearing as follows:

> THE JUDGE: "Alright . . . that's enough theatrics. . . ."
>
> " . . .
>
> THE JUDGE: "The objection is sustained. Don't come up on this witness and yell at him. If you want to yell, that's fine. But you have to stay back and yell."
>
> DEFENSE COUNSEL: "I'd like a sidebar, please."
>
> THE JUDGE: "No. You just keep going. But I don't want you standing on top of any of these witnesses and yell [*sic*]."

The defendant argues that, by reprimanding defense counsel in the jury's presence, the judge unfairly demonstrated to the jury his disfavor of the defendant's position. See *Commonwealth* v. *Sneed*, 376 Mass. 867, 870 (1978) ("any judicial comment is likely to be accorded substantial weight by the jury"). Although "[t]rial judges should refrain as far as reasonably possible from making critical comments before the jury," *Commonwealth* v. *Fitzgerald*, 380 Mass. 840, 847 (1980), the judge's admonitions in this case were not improper. In *Commonwealth* v. *Carney*, 31 Mass. App. Ct. 250, 254 (1991), the trial judge similarly cautioned defense counsel "against combatively approaching the witness — 'jumping at her.' " The Appeals Court concluded in that case, that "similar comments by the judge, too numerous to detail, were constructive, and not, as argued by the defense, derisively prejudicial. See *Commonwealth* v. *Wilson*, 381 Mass. 90, 118-119 (1980) (the judge must be the trial's 'directing and controlling mind')." *Id.* at 254. The Appeals Court's reasoning applies with equal force to the present case. In addition, the result we reach on this issue is supported by the

judge's instruction to the jury "not [to] read into these instructions or in anything else that I may have said or done during the course of this trial . . . any indication whatsoever as to what I think the verdict should be. It's entirely up to you. You're the fact finders in this case."

We shall now briefly discuss the defendant's contention that, because of prosecutorial misconduct in the course of the trial, a new trial is required. The defendant's first claim relates to the disappearance of the blood-stained knife that the police officers discovered under the loveseat cushions after Jordan's murder. The defendant says that the prosecutor committed reversible error in the course of her examination of Detective Horsely by insinuating that defense counsel had taken the knife from the police. The defendant relies on the following question and answer.

> THE PROSECUTOR: "What did you do with the knife subsequent to the grand jury?"

> THE WITNESS: "In the early summer months of 1990, [defense counsel] came to the office and he was shown the knife."

The judge was not persuaded that the alleged insinuation had been made. We, too, are not persuaded.

The defendant also argues on appeal for the first time that his conviction should be reversed because of the following remarks in the prosecutor's closing argument to the jury:

> (a) "And, ladies and gentlemen, what's the best way to be able to look and say, 'Hey, that was the truth that I heard.' I suggest to you that when that statement or that witness is corroborated by a physical piece of evidence, because you can't holler at physical evidence, you can't yell at physical evidence, you can't yell at physical evidence until it gets shaken up and doesn't know which day it is. Physical evidence exists no matter what kinds of questions are screamed at it. It doesn't change it."

> (b) "Billy Scott told you the words of the defendant a week before this incident: 'I'll take care of him.' Those are not the words of Billy Scott. He told you what he heard, and Billy told us that the next day. Yeah, did he

get confused? Could you trip him up between September first and September second? Yes, you could on the dates. You could scream at him and completely confuse him.. Remember little Billy sitting there on the stand? But he always, in every statement, was very clear that the incident involving the knife was the day after the incident involving Kenny and Ernie. He could tell you the sequence. He just couldn't tell you the date; the number."

The thrust of the defendant's argument appears to be that, by redirecting the jury's attention to the judge's reprimand of defense counsel for "standing on top of" and "yelling at" Scott, the prosecutor improperly "undermined the credibility of defense counsel." Because the defendant did not object at trial to the allegedly improper remarks, we inquire only as to whether, due to the remarks, there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Costa,* 414 Mass. 618, 627-628 (1993). *Commonwealth* v. *Wright, supra* at 681. We are confident that the remarks in question did not create a substantial likelihood of a miscarriage of justice.

We turn now to the defendant's contentions relative to the judge's final jury instructions. The defendant criticizes (1) the judge's instruction concerning the proper weight to be given to inconsistencies within a witness's testimony, (2) the judge's failure to instruct the jury concerning the weight they may give to a defendant's lack of motive as it may bear on the question of intent, (3) the judge's refusal to give a requested missing witness instruction, (4) the judge's refusal to give a manslaughter instruction, and (5) the judge's explication of the Commonwealth's burden of proof beyond a reasonable doubt.

(1) Immediately preceding his instruction concerning inconsistencies in a witness's testimony, the judge discussed other credibility factors such as the witness's opportunity to observe events described, the witness's memory, demeanor, bias, and reasonableness. Then, he instructed as follows:

"If you find that a witness's testimony is contradicted by what the witness has said or done at some other time or by the testimony of other witnesses, then you can disbelieve all or any part of that witness's testimony. In deciding whether or not to believe someone, based on

contradiction, keep a couple of things in mind. First of all, people are human. Sometimes we forget. A contradiction can be an innocent lapse of memory or it can be an intentional falsehood. Consider, therefore, whether it has to do with an important fact or only a small detail. Also, remember that different people observing the same event may remember it differently, and therefore testify differently about it. If, however, a witness is shown knowingly to have testified falsely concerning a material matter, you have a right to distrust that witness's testimony and other particulars, and you may reject all the testimony of that witness or give it such credibility as you think it deserves. The testimony of a witness may be discredited or impeached by showing that he or she previously made statements which are inconsistent with his present testimony."

The defendant argues that, by these instructions, the judge erroneously and prejudicially instructed the jury to discount testimonial inconsistencies involving small details when determining witness credibility, thereby undoing defense efforts to impeach prosecution witnesses and invading the province of the jury. The defendant asserts that the decisions in *Commonwealth* v. *Murchison*, 418 Mass. 58 (1994), and *Commonwealth* v. *Rodriguez*, 6 Mass. App. Ct. 738 (1978), support his argument. We are not persuaded by the defendant's argument. The instructions in those cases were critically different from the instructions here. As the Appeals Court said in *Rodriguez, supra* at 742, "There is nothing improper in a judge's pointing out factors to be considered by the jury in weighing the credibility of oral testimony so long as he does so fairly, gives the jury no indication of whom he believes, and clearly places the function of ultimate appraisal of the testimony on the jury." The instructions in this case met the standard enunciated in *Rodriguez*.

(2) The defendant argues that the judge erred in instructing the jury that the Commonwealth was not required to prove the defendant's motive without also instructing that, in connection with determining whether the defendant had the intent to kill required for murder, the jury properly could consider whether the defendant had a motive to do so. See *Commonwealth* v. *Noxon*, 319 Mass. 495, 546 (1946) ("as bearing upon the question of intent, motive or absence of mo-

tive may present considerations of the utmost importance"). The defendant neither requested such an instruction at trial nor objected to the judge's failure to give it. The omission of that instruction in this case did not result in a substantial likelihood of a miscarriage of justice.

(3) The defendant requested the judge to instruct the jury that they could infer from Michael Siler's absence from the trial that his testimony would have been unfavorable to the Commonwealth. The judge refused to give that instruction. "Where a party has knowledge of a person who can be located and brought forward, who is friendly to, or at least not hostilely disposed toward, the party, and who can be expected to give testimony of distinct importance to the case, the party would naturally offer that person as a witness. If, then, without explanation, he does not do so, the jury may, if they think reasonable in the circumstances, infer that that person, had he been called, would have given testimony unfavorable to the party." *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986).

The defendant argues that a missing witness instruction should have been given because Siler was important to the Commonwealth's case. Siler was important, the defendant says, because of the evidence that the defendant had threatened him and because Siler was present at Jordan's house after 10 P.M. on the night Jordan was killed. There is no basis for an inference that if Siler had testified, he would have given testimony unfavorable to the Commonwealth. Furthermore, the defendant has not demonstrated that Siler's testimony, had he been called as a witness, would likely have been anything other than "merely corroborative of, or merely cumulative upon, the testimony of one or more witnesses who [were] called." *Id.* The requested instruction, therefore, would have been inappropriate.

(4) The defendant requested, but did not receive, a manslaughter instruction. He contends on appeal that the judge's failure to give the requested instruction was reversible error. If there is insufficient evidence to warrant a conviction of manslaughter, a judge's refusal to instruct the jury on that crime cannot be erroneous. *Commonwealth* v. *Bellamy*, 391 Mass. 511, 514 (1984). *Commonwealth* v. *Lee*, 383 Mass. 507, 513 (1981). There was no evidence in this case that the killing occurred in the heat of sudden passion on reasonable provo-

cation or sudden combat. Thus, there was insufficient evidence of voluntary manslaughter. The defendant does not contend otherwise.

An involuntary manslaughter instruction is inappropriate in the absence of evidence that would warrant a finding that the death occurred unintentionally in the commission of a battery or by reckless and wanton misconduct. *Commonwealth* v. *Ferreira*, 417 Mass. 592, 599 (1994). *Commonwealth* v. *Sheppard*, 404 Mass. 774, 776 (1989). The defendant asserts only that evidence that he drank alcohol on the day of the killing and later "conked out" would have warranted a finding that the death was unintentional and occurred in the commission of a battery or by reckless and wanton misconduct. We do not agree. The evidence showed that the victim's torso had eleven stab wounds, two of which struck his left lung. There were three lacerations on Jordan's head that were consistent with blunt trauma caused by the edge of the nightstand near his bed. A forensic pathologist testified that the base of Jordan's skull was severely shattered and that he could observe the brain coming out from the depressed skull fracture. No view of the evidence would have warranted a finding that Jordan's death was caused unintentionally.

(5) Although the defendant did not object at trial to the judge's instruction on the Commonwealth's burden of proof beyond a reasonable doubt, he argues on appeal that those instructions erroneously omitted an essential part of the frequently quoted reasonable doubt language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). The *Webster* language to which the defendant points is, "it is not sufficient to establish a probability, though a strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary." In his brief, the defendant argues, "In the transcript of the instructions to the jury, which may or may not be correct, this language was replaced as follows: 'It is not sufficient to establish a probability or a strong one *arising from the doubt and the chances* that if that charge is more likely to be true than not true.' The absence of clear and unambiguous language that a probability, even a strong probability, does not amount to proof beyond a reasonable doubt, improperly lowered the burden of proof required in criminal cases" (emphasis in defendant's brief).

The defendant's observation that "the transcript of the instructions to the jury . . . may or may not be correct" is well taken. That the transcript is incorrect is supported by the fact that, after the instructions were completed, neither counsel brought to the judge's attention that one of his instructions bearing on the important matter of the Commonwealth's burden of proof was incomprehensible or otherwise defective.

In any event, "constitutionally erroneous jury instructions are not to be viewed in isolation but rather in the context of the charge as a whole, so that a reviewing court can assess the possible impact of the error on the deliberations of a reasonable juror." *Commonwealth* v. *Koonce*, 418 Mass. 367, 371 (1994), quoting *Commonwealth* v. *Repoza*, 400 Mass. 516, 519, cert. denied, 484 U.S. 935 (1987). See *Commonwealth* v. *Smiledge*, 419 Mass. 156, 161 (1994); *Commonwealth* v. *Owens*, 414 Mass. 595, 607 (1993). In addition to the obviously flawed statement in the judge's instructions to which the defendant has called our attention, the transcript contains other such statements on which the defendant apparently does not rely — and which also were not brought to the judge's attention. According to the transcript, the relevant instructions were as follows:

> "The third rule in every criminal case is that the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant is guilty of the charge that's made against him. What is reasonable doubt? The term is often used and probably pretty well understood, but it's not that easily defined. It's not mere possible doubt, because everything relating to human affairs and depending on moral limits, is open to some possible or imaginary doubt. Reasonable doubt is that state or the case when, after the entire comparison and consideration of all the evidence, the minds are left in that condition that they cannot say that they felt an abiding conviction to a moral certainty of the truth of the charge. The burden of proof is on the prosecutor. All presumptions of law independent of evidence are in favor of innocence. If, after all the evidence is presented, there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal.

"It is not sufficient to establish a probability or a strong one arising from the doubt and the chances that if that charge is more likely to be true than not true. The evidence must establish the truth of the fact or reasonable and moral certainty. Certainty that convinces and directs the understanding and satisfies the reason and judgment, you, the jurors, who are bound conscientiously upon it. This would be proof beyond a reasonable doubt."

Although some of the statements contained in the charge as shown in the transcript may be unintelligible, they do not suggest any diminution of the Commonwealth's burden of proof as correctly set forth in the instructions viewed as a whole. The jury were not left with contradictory instructions. Even if we assume that the transcript accurately reflects the instructions, no juror reasonably could have misunderstood the Commonwealth's burden of proof. Therefore, the instructions did not create a substantial likelihood of a miscarriage of justice.

Finally, the defendant asks us to exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the verdict to murder in the second degree. After thorough review of the law and the evidence, we decline to do so.

*Judgment affirmed.*